611 F.2d 710
 Frank R. WEST, Appellant,
v.
Bob BERGLAND, Secretary of the Department of Agriculture,
and Donald Houston, Acting Administrator of the
Food Safety and Quality Service of the
Department of Agriculture, Appellees.
 No. 79-1711.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Oct. 11, 1979.
Decided Dec. 19, 1979.
Rehearing and Rehearing En Banc Denied Jan. 14, 1980.
 
 B. J. Rothbaum, Jr., Linn, Helms, Kirk & Burkett, Oklahoma City, Okl., for appellant; James P. Linn, Oklahoma City, Okl., David S. Lathrop, Lathrop, Albracht & Swenson, Omaha, Neb., on brief.
 Linda M. Cole, Dept. of Justice, Civ. Div., Washington, D. C., for appellees; Alice Daniel, Acting Asst. Atty. Gen., Robert S. Greenspan, Atty., Washington, D. C., and James Michael Kelly, Asst. Gen. Counsel, Raymond W. Fullerton, Director, Litigation Div. and Marshall M. Marcus, Atty., Office of the General Counsel, U. S. Dept. of Agri., Washington, D. C., on brief.
 Before BRIGHT, ROSS and STEPHENSON, Circuit Judges.
 STEPHENSON, Circuit Judge.
 
 
 1
 The appellant, Frank R. West, sought to have the district court[1] enjoin the Secretary of Agriculture from holding an administrative hearing to determine whether the Secretary's meat grading and acceptance services should be withdrawn for misconduct. West challenged the regulation under which the Secretary was proceeding as invalid. This appeal is from the district court's denial of injunctive relief. The issues are (1) whether West must exhaust his administrative remedies before bringing judicial challenge to the regulation, and (2) if not, whether the regulation is authorized by statute. We affirm the district court's decision to reach the question of the regulation's validity and to uphold it as impliedly authorized by statute.
 
 
 2
 I. Factual Background.
 
 
 3
 Appellant West is engaged in the business of buying and selling livestock. In this capacity he receives meat grading and acceptance services from the Department of Agriculture pursuant to section 203(h) of the Agricultural Marketing Act of 1946.[2] On January 14, 1977, West was convicted, after his plea of guilty, of conspiring to violate 21 U.S.C. §§ 610(c) and 676 in causing meat to be misbranded, in violation of 18 U.S.C. § 371. A charge relating to West's plea was that he had caused employees to make gifts to a federal meat grader.
 
 
 4
 On August 9, 1977, the Administrator of the Food Safety and Quality Service filed an administrative complaint against West in a proceeding before the Secretary of Agriculture.[3] The complaint alleged that West had knowingly authorized the bribing of a federal meat grader. The complaint proposed, under the authority of 7 C.F.R. § 53.13(a) (1977),[4] to withdraw grading and acceptance services from West "for a period of time necessary to insure the integrity of the Meat Grading and Acceptance Service, and such additional time as may be required until (West) can prove to the Service that necessary safeguards have been provided to assure (he) will not in the future violate the (Agricultural Marketing Act of 1946 or the regulations issued under it)." Withdrawal will not become effective in this case, however, until a final agency order adverse to West. In the meantime West may continue to receive grading and acceptance services.
 
 
 5
 On February 13, 1979, West filed a complaint in federal district court to prevent the initiation of the administrative hearing and secured a temporary order that restrained the Secretary from proceeding any further.[5] After briefs and oral arguments, however, the district court dissolved the temporary restraining order and denied West's application for permanent injunctive relief.
 
 
 6
 II. Whether Administrative Remedies Must be Exhausted.
 
 
 7
 West makes no claim that regulation 53.13(a) runs counter to any express statutory limit to the Secretary's authority. Rather, he argues that the nature of the regulation is such that it must be expressly authorized, and that it is not. Alternatively, he argues that any implied authorization is negated by legislative history, the tone of the statute, and congressional practice with respect to related statutes. The Secretary responds that a court should not even consider West's contentions except upon appeal from a final agency decision. West rejoins that because the regulation is void there are no valid administrative remedies to exhaust. The district court did not expressly address these contentions but implicitly held that exhaustion was not required.[6] We agree.
 
 
 8
 Normally, a litigant is not entitled to a judicial hearing on the merits of his claim until he has exhausted available administrative remedies. E. g., Myers v. Bethlehem Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). This is not a rule to be applied woodenly, however. Except in those cases where exhaustion of administrative remedies is specifically required by statute, See, e. g., Weinberger v. Salfi, 422 U.S. 749, 766, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), administrative remedies need not be pursued if the litigant's interests in immediate judicial review outweigh the government's interests in the efficiency or administrative autonomy that the exhaustion doctrine is designed to further. This is the general test our court adopted in United States v. Newmann, 478 F.2d 829, 831 (8th Cir. 1973).
 
 
 9
 A. Governmental Interests in Requiring Exhaustion.
 
 
 10
 We begin by considering the governmental interests in requiring West to exhaust his remedies on the question of agency jurisdiction, mindful whether "allowing all similarly situated (individuals) to bypass (the administrative avenue in question) would seriously impair the (agency's) ability to perform its functions." McGee v. United States, 402 U.S. 479, 484, 91 S.Ct. 1565, 1569, 29 L.Ed.2d 47 (1971). First among these governmental interests is that of allowing the agency to "perform functions within its special competence." Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 818, 31 L.Ed.2d 17 (1972). These functions include specialized fact-finding, E. g., Lone Star Cement Co. v. FTC, 339 F.2d 505, 512 (9th Cir. 1964), interpretation of disputed technical subject matter, E. g., Weinberger v. Bentex Pharmaceuticals, 412 U.S. 645, 653-54, 93 S.Ct. 2488, 37 L.Ed.2d 235 (1973), and resolving disputes concerning the meaning of the agency's regulations, E. g., City of New York v. New York Telephone Co., 468 F.2d 1401, 1403 (Temp.Emer.Ct.App.1972). Despite the Secretary's contentions to the contrary, we do not think the judicial policy of deferring decision until an administrative agency has exercised one or more of these functions is strongly implicated in this case. First, the relevant facts appear on the face of the pleadings, and they are not of such a nature that the agency is best equipped to interpret them.[7] Second, there is no question that the regulation, if valid, authorizes the Secretary to withdraw the services provided under the Act. The only question on which West seeks to avoid exhaustion is not one requiring application of specialized agency understanding, then. It is one well within judicial competence: whether the regulation is authorized by the statute.
 
 
 11
 A second governmental interest in requiring exhaustion is discouraging "frequent and deliberate flouting of the administrative process." United States v. Newmann, supra. This interest is strongest where a grant of judicial review would induce individuals to frustrate agency process by challenging agency action only after the opportunity for agency decision has passed. E. g., McGee v. United States, supra, 402 U.S. at 491, 91 S.Ct. 1565 (selective service registrant convicted of failing to submit to induction twice sidestepped administrative review of his draft classification in order to "take a chance" in court on his defense of erroneous classification). This interest is not particularly prominent here, for a grant of judicial review under the present circumstances would not encourage individuals in West's general situation to sidestep agency process. This is not a case where remedies lie unused in the past. West brings this challenge ahead of agency action, not after the opportunity for application of agency expertise is gone. Nor would a grant of immediate judicial review in this case encourage individuals in West's position to seek early review on insubstantial questions in order to gain delay. We recognize that an exhaustion decision requires attention to the particular administrative scheme involved, and that the Secretary's ability to administer grading services for a large variety of products may be at stake.[8] But West's claim is out of the ordinary. It requires no application of special agency competence and, while not manifestly compelling on its merits, is not frivolous, either. It presents a question of first impression and is not easily rejected. We doubt, then, that early review of questions of this sort will induce litigious interruption of the agency's enforcement program. Courts are well equipped to deal with such tactics should they arise. "Insubstantial claims can usually be weeded out with dispatch." Oestereich v. Selective Service System, 393 U.S. 233, 242, 89 S.Ct. 414, 21 L.Ed.2d 402 (Harlan, J., concurring). See also Abbott Laboratories v. Gardner, 387 U.S. 136, 154-55, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).
 
 
 12
 Although these first two interests in administrative autonomy and efficiency thus do not loom large in this case, the exhaustion doctrine requires us to consider two other interests. The first is that in allowing the agency to have the first opportunity to develop the facts and apply the law it was designed to administer. As the Supreme Court explained in McKart v. United States :
 
 
 13
 The agency, like a trial court, is created for the purpose of applying a statute in the first instance. Accordingly, it is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. * * * And of course it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages. The very same reasons lie behind judicial rules sharply limiting interlocutory appeals.
 
 
 14
 395 U.S. 185, at 193-94, 89 S.Ct. 1657, 1662-1663, 23 L.Ed.2d 194. Cf. McLish v. Roff, 141 U.S. 661, 665-66, 12 S.Ct. 118, 35 L.Ed. 893 (1891). Permitting the agency to perform its "trial court" function not only serves interests in administrative autonomy and efficiency but also generally assists ultimate judicial review, if any should be necessary.
 
 
 15
 A second interest in administrative autonomy, which parallels an interest in judicial efficiency, is that of allowing agencies to correct their own errors, and in so doing moot controversies and obviate judicial review. Parisi v. Davidson, supra. We think this interest is but weakly implicated here. Although we see nothing in the record or the briefs to indicate that the jurisdictional challenges West mounts have ever been presented to the Secretary for his formal decision, Secretary's counsel remind us that "for more than (forty) years, the Secretary has ruled that he was empowered to impose administrative sanctions * * * to assure that his grading services are upright." Appellee's Brief at 37. In any event, we think it improbable that the agency, having brought its complaint on the strength of regulation 53.13(a), will suddenly agree with West that it is void. A further reason to expect no vacillation on the part of the Secretary is that the regulation, in place now for some twenty years, is representative of a host of similar regulations relating to other agricultural products.[9] While the mere probability of an adverse agency decision does not eliminate the interest in agency self-correction, See Lone Star Cement Corp. v. FTC, supra ; See generally Spanish Int'l Broadcasting Co. v. FCC, 128 U.S.App.D.C. 93, 104, 385 F.2d 615, 626 & n.50 (D.C.Cir.1967), we cannot accord it much weight where, as here, the outcome is all but certain. See, e. g., Diapulse Corp. of America v. FDA, 500 F.2d 75, 78 (2d Cir. 1974).
 
 
 16
 Of course, there are other unresolved questions here, which if resolved in West's favor would obviate judicial review. For example, if West were to convince the Secretary that a withdrawal of meat grading and acceptance services would be unjustified, or unnecessary, under the circumstances, the controversy would be at an end. We note this factor, but cannot give it dispositive weight since it is a factor implicated in virtually any exhaustion case. E. g., Touche Ross & Co. v. SEC, 609 F.2d 570 (2d Cir. 1979) (judicial review of agency jurisdiction permitted ahead of agency determination whether suspension of privilege justified under the circumstances).
 
 
 17
 Our identification of the governmental interests in this case presupposes that there are, at least arguably, valid administrative remedies to pursue. West contends that there is no governmental interest here because "there is no properly authorized administrative procedure for (him) to exhaust and * * * the administrative authorities who seek to determine (his) case have no lawful right to do so." Allen v. Grand Central Aircraft Co., 347 U.S. 535, 540, 74 S.Ct. 745, 748, 98 L.Ed. 933 (1954); Cf. Skinner & Eddy Corp. v. United States, 249 U.S. 557, 562, 39 S.Ct. 375, 63 L.Ed. 772 (1919). We must reject this contention in its broadly based form, for to accept it would reduce the exhaustion doctrine to a nullity. See K. Davis, Administrative Law § 20.02 at 65, § 20.04 at 79 (1958). A person cannot evade agency process simply by claiming the agency is operating Ultra vires.
 
 
 18
 This claim has justified early judicial review, however, in those cases in which agencies have transgressed clearly marked boundaries to their jurisdiction. West relies on two of these cases, Oestereich v. Selective Service System, supra ; Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958). Both cases admitted an individual to a judicial forum before the completion of prescribed procedures. In Oestereich, a theology student who had received the draft exemption he was statutorily entitled to was reclassified I-A after he had turned in his draft card in protest. The sole basis of the reclassification was a Selective Service regulation that plainly permitted the Service to reclassify those who had been "delinquent" in failing to retain their draft cards. The student, prior to induction, sought to enjoin the reclassification on the basis that the regulation was contrary to statute. The Court characterized the Selective Service Board's action as a "clear departure * * * from its statutory mandate. To hold that a person deprived of his statutory exemption in such a blatantly lawless manner must either be inducted and raise his protest through habeas corpus or defy induction and defend his refusal in a criminal prosecution is to construe the Act with unnecessary harshness." 393 U.S. at 238, 89 S.Ct. at 416-417. In Leedom, the National Labor Relations Board included professional employees in a collective bargaining unit without permitting them to vote whether to belong to that unit. Although there had been no final agency action, the employees were permitted to challenge the inclusion, in light of a specific statutory provision that proscribed inclusion of professional employees in a collective bargaining unit without their approval by majority vote. "Plainly, (the Board's inclusion) was an attempted exercise of power that had been specifically withheld. It deprived the professional employees of a 'right' assured to them by Congress. Surely, in these circumstances, a Federal District Court has jurisdiction of an original suit to prevent deprivation of a right so given." 358 U.S. at 189, 79 S.Ct. at 184.
 
 
 19
 Here, by contrast, West can point to no statutory right that the Secretary is abridging, no specific statutory provision that the Secretary's proposed withdrawal of service would contravene. The Secretary is directed to provide grading services, but not unconditionally. His decision to provide these services only to those recipients who refrain from engaging in conduct detrimental to the service is by no means a "clear departure" from his statutory mandate or an abridgment of West's "statutory right."
 
 
 20
 B. West's Interests in Securing Immediate Judicial Review.
 
 
 21
 Having examined the governmental interests in this case, we turn to an examination of the individual's interests in an immediate judicial resolution, before considering whether the balance of interests favors requiring exhaustion of administrative remedies. To justify judicial interference with agency process that is not clearly Ultra vires, an individual must, generally speaking, show some "exceptional circumstance." See United States v. Newmann, supra. Courts have traditionally required the individual to make a cogent showing that denial of immediate judicial review will subject him either to "irreparable injury" or an "inadequate remedy." See, e. g., Bannercraft Clothing Co. v. Renegotiation Board, 151 U.S.App.D.C. 174, 184-85, 466 F.2d 345, 355-56 (D.C.Cir.1972), Rev'd on other grounds, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 132 (1974). Examples of irreparable injury include extraordinary litigation expense, E. g., Public Utilities Comm. v. United Fuel Gas Co., 317 U.S. 456, 469, 63 S.Ct. 369, 87 L.Ed. 396 (1943); continued subjection to a challenged regulation due to unreasonable administrative delay in responding to the challenge, E. g., Smith v. Illinois Bell Telephone Co., 270 U.S. 587, 591, 46 S.Ct. 408, 70 L.Ed. 747 (1926); loss of first amendment freedoms, E. g., Wolff v. Selective Service Local Board No. 16, 372 F.2d 817, 825 (2d Cir. 1967); and the immediate destruction or loss of the very substantive right that the individual seeks to protect, E. g., McKart v. United States, supra, 395 U.S. at 203, 89 S.Ct. 1657 (criminal defendant's complete defense of erroneous draft classification would be wholly lost, absent judicial review); Utah Fuel Co. v. National Bituminous Coal Comm., 306 U.S. 56, 59-60, 59 S.Ct. 409, 83 L.Ed. 483 (1939) (asserted right of confidentiality would be destroyed by agency publication, absent immediate judicial review).
 
 
 22
 West's claims of irreparable injury fall within none of these categories. First, he claims that "the proceeding itself constitutes irreparable injury" because he cannot recover its costs should the Secretary prove to be without jurisdiction. The unrecoupable expense of litigation, however, is not the irreparable injury contemplated as a prerequisite to equitable relief. Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 24, 94 S.Ct. 1028, 39 L.Ed.2d 132 (1974). Second, West claims that he is irreparably injured in that deprivation of meat grading services constitutes irreparable injury. He will not be so deprived, however, if he is deprived at all, until the conclusion of agency proceedings, or, if a stay is granted, until judicial review.[10] See, e. g., Arrow Meat Co. v. Freeman, 261 F.Supp. 622, 624 (D.Ore.1966) (thirty days' suspension of meat grading services stayed until judicial review). Any deprivation that will occur, then, is that which inevitably accompanies an agency proceeding of this sort.
 
 
 23
 Nor does West clearly demonstrate that his remedy is otherwise inadequate.[11] West cannot rely on Skinner & Eddy Corp. v. United States, supra, in which the party challenging an agency's statutory authority to approve a rate hike without a prior hearing could attack the rate before the agency only as "unreasonably high or discriminatory." See Jewel Co. v. FTC, 432 F.2d 1155, 1158 (7th Cir. 1970); L. Jaffe, Judicial Control of Administrative Action 428 (1965). Here, West may challenge the statutory authority for the agency's action before the agency itself. See generally, e. g., California v. FTC, 549 F.2d 1321, 1324 (9th Cir. 1977) (as a general rule, an agency should initially determine its own jurisdiction). And West can in any event obtain judicial review of the ultimate agency decision. Compare Texaco, Inc. v. FTC, 301 F.2d 662, 663 (5th Cir. 1962).
 
 
 24
 West can, however, point to the probability of adverse agency decision on the question whether regulation 53.13(a) is valid and argue that his administrative remedy is "inadequate" because futile. See L. Jaffe, Supra, at 449. But see Lone Star Cement Corp. v. FTC, supra. The Second Circuit, in a recent case that also involved a pre-hearing challenge to the validity of an agency's enforcement regulation, declined to require exhaustion because, among other reasons, it was not likely that the agency would declare that its own long-standing regulation was statutorily unauthorized. Touche Ross & Co. v. SEC, 609 F.2d at 577 (2d Cir. 1979).
 
 
 25
 The Touche Ross court indicated that the harm that would be sustained by litigant if he is required to exhaust his administrative remedies is a relevant factor to consider, but not controlling. The court opined that the Supreme Court has not made irreparable injury an inflexible prerequisite to avoiding exhaustion. While we do not necessarily share the Second Circuit's certainty concerning the attitude of the Supreme Court,[12] we continue to believe that the proper approach toward exhaustion is the balancing of individual and governmental interests that was suggested by the Supreme Court in McKart v. United States, supra, and adopted by our court in United States v. Newmann, supra, which we have elaborated upon here. Classic irreparable harm or inadequate injury may be required, of course, to outweigh governmental interests where they are strongly implicated. Where they are not, however, factors of litigation expense or loss of reputation may become significant. See Touche Ross & Co. v. SEC, supra, 609 F.2d at 572-77 (declining to require exhaustion on ground of inadequate governmental interest, without requiring clear showing of irreparable injury); Finnerty v. Cowen, 508 F.2d 979, 982-83 (2d Cir. 1974) (same); Diapulse Corp. of America v. FDA, supra, 500 F.2d at 77-78 (same); Consumers Union v. Cost of Living Council, 491 F.2d 1396, 1399-1400 (Temp.Emer.Ct.App.), Cert. denied, 416 U.S. 984, 94 S.Ct. 2387, 40 L.Ed.2d 761 (1974) (same); Pan American World Airways, Inc. v. Boyd, 207 F.Supp. 152, 160 (D.D.C.1962) (alternative holding) (same).
 
 
 26
 C. Balancing of Interests.
 
 
 27
 Reviewing the foregoing, we perceive an arguable claim that the basis of the Secretary's power to proceed is facially invalid. The question of validity involves no dispute of fact that is necessary to a decision, no specialized understanding that an agency would be likely to contribute. Instead, the issue is one of statutory construction and can be decided on the pleadings. Although the litigant does not clearly satisfy the classic requirements of equitable relief, requiring him to resort first to the administrative process will subject him to unrecoverable loss in the form of litigation expense. This cost, although "part of the social burden of living under government," Petroleum Exploration, Inc. v. Public Service Commission, 304 U.S. 209, 222, 58 S.Ct. 834, 841, 82 L.Ed. 1294 (1938), is not a burden we should impose too blithely. Here, given that the agency is bringing a proceeding on the basis of the very regulation in question, and given that the regulation has been followed regularly and is representative of a family of similar regulations, we believe the agency's view of the regulation's validity is virtually immutable, and that expenses incurred to challenge the regulation within the agency will be expended in vain, without any compensating clarification of the issue. Although the question is close, we conclude that the district court acted within its discretion in declining to require exhaustion. We now turn to the merits.
 
 
 28
 III. Whether Regulation 53.13(a) is Authorized by Statute.
 
 
 29
 As with any matter of statutory construction, we begin with the language of the statute. Southeastern Community College v. Davis, 442 U.S. 397, 405, 99 S.Ct. 2361, 2366, 60 L.Ed.2d 980 (1979). Section 203(h) of the Agricultural Marketing Act of 1946 (the Act) directs and authorizes the Secretary of Agriculture to certify the grade of agricultural products, "except that no person shall be required to use the service authorized by this subsection." 7 U.S.C. § 1622(h) (hereinafter referred to as section 1622(h)). Section 205(b) of the Act further provides that the Secretary "shall promulgate such orders, rules, and regulations as he deems necessary to carry out the provisions of this chapter." 7 U.S.C. § 1624(b).
 
 
 30
 Within two years of the Act's passage the Secretary issued 7 C.F.R. § 53.12 (1949), which permitted him to suspend grading services, after a hearing, for "interference with or obstruction of any employee of the Department in the performance of his duties under the regulations, by intimidation, threats, assaults, Or any other improper means." 13 Fed.Reg. 1275, 1278 (Mar. 10, 1948) (emphasis added). In 1959, the Secretary issued the current regulation, 7 C.F.R. § 53.13(a) (1977), whose similar but more specific language is set out above. See note 4 Supra.
 
 
 31
 The substance of the current regulation and its predecessor, then, was adopted soon after the passage of the Act and has been in effect for about thirty years.[13] Absent "compelling indications" that the Secretary is wrong, his long-standing interpretation as to the regulation's validity is entitled to great deference. See, e. g., Zenith Radio Corp. v. United States, 437 U.S. 443, 450-51, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978).
 
 
 32
 Further, because Congress has expressly authorized the Secretary to promulgate such rules as may be necessary to carry out the provisions of the Act, West's burden in attacking regulation 53.13(a) is especially great if the regulation is "reasonably related" to the purpose of enabling legislation. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973); Graham v. National Transportation Safety Board, 530 F.2d 317, 319 (8th Cir. 1976). The declared intent of the Act is "to provide for * * * an integrated administration of all laws enacted by Congress to aid the distribution of agricultural products through research, market aids and services, and regulatory activities, to the end that marketing methods and facilities may be improved * * *." 7 U.S.C. § 1621. More specifically, the grading activities authorized by section 1622 are designed to ensure "that consumers may be able to obtain the quality product which they desire." Applying the test stated in Mourning and adopted in Graham, the district court reasoned:
 
 
 33
 The integrity of the federal grading program rests on its ability to provide the consuming public with accurate and honest grading of meat and meat products. Such actions as bribery of inspectors directly impair the program's ability to achieve such a goal. In promulgating § 53.13, the Secretary has, through the establishment of certain conditions under which federal meat grading services will be provided or denied, acted to protect the program from the adverse impact of such activities. This action is rationally related to the purpose of the enabling Act.
 
 
 34
 West contends that this reasoning is flawed because the Act is voluntary in nature. He argues that the exclusive sanction for abusing the grading service is the criminal penalty Congress authorized in a 1955 amendment to section 1622(h). That amendment provides for a fine of up to $1,000 and imprisonment up to one year for the knowing falsification of inspection or grading certificates. Thus, West argues that the Act authorizes only "housekeeping" regulations and that regulation 53.13(a) is void because out of harmony with the Act. See, e. g., Manhatten General Equipment Co. v. Commissioner, 297 U.S. 129, 134-35, 56 S.Ct. 397, 80 L.Ed. 528 (1936).
 
 
 35
 These arguments do not rebut the force of the district court's reasoning. The voluntary nature of the Act does not prevent the Secretary from imposing reasonable requirements upon the recipients of the service. We specifically so held in Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 237 (8th Cir. 1975), in which we upheld the Secretary's decision to require recipients of beef grading services to accept yield grading as a condition of receiving quality grading. The imposition of mandatory yield grading was reasonable in that it advanced the Act's goals, which included the goal of making available quality products to consumers. Regulation 53.13, designed to ensure that meat grading procedures remain honest, is, if anything, more closely connected with this statutory purpose. The inclusion of a penal sanction by Congress in 1955 for falsification of official certificates does not vitiate the agency's power to correct other abuses that threaten the integrity of the meat grading scheme. See Jacquet v. Westerfield, 569 F.2d 1339, 1345 (5th Cir. 1978). The fact that Congress has addressed a specific class of activities does not foreclose an agency, expressly empowered to make necessary rules, from addressing others. See Mourning v. Family Publications Service, Inc., supra, 411 U.S. at 372-73, 93 S.Ct. 1652.
 
 
 36
 West argues, however, that the regulation in question goes far beyond that in Butz, that it asserts the "awesome power to suspend," which can be granted by Congress only by express language.[14] West relies heavily on SEC v. Sloane, 436 U.S. 103, 98 S.Ct. 1702, 56 L.Ed.2d 148 (1978), but an analysis of Sloane demonstrates the infirmity of his position. Sloane held that the Securities Exchange Commission (SEC) was not authorized by the 1934 Securities Exchange Act to issue a series of ten-day orders that suspended trading in a corporation's stock. One reason for the Court's decision was that it would not find conferred, absent an "unmistakable mandate," the "awesome power" to suspend Summarily, without notice, hearing, or even a statement of findings.[15] Here, of course, the Secretary is asserting only the power to withdraw services some time after a full agency hearing.[16]
 
 
 37
 West next argues that any implied authorization for withdrawal of grading services is negated by the congressional practice of authorizing the Secretary to suspend or withdraw services with express language, and with specific limits on the duration of the sanction.[17] West places special reliance on language this court cited in State Highway Commission v. Volpe, 479 F.2d 1099, 1114 (8th Cir. 1973): " '(w)here Congress has consistently made express its delegation of a particular power, its silence is strong evidence that it did not intend to grant the power.' "
 
 
 38
 This argument would be relevant if the service here in question were akin to those whose withdrawal is expressly authorized. But it is not. The other services are available to persons who must be licensed by the Secretary. Without a license they are legally forbidden to deal with third parties. With respect to meat grading services, however, "no person shall be required to use (them)." 7 U.S.C. § 1622(h). By withdrawing meat grading services the Secretary does not suspend a person's right to deal with third parties. Rather, the Secretary is acting to determine the persons with whom He will deal.[18] See, e. g., Gonzalez v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570 (D.C.Cir.1964) (debarment of contractors by Secretary, after hearing, impliedly authorized, despite potential adverse economic impact on the individual involved).
 
 
 39
 Moreover, contrary to West's assertion, the Secretary's power to suspend is not unbounded. Instead, it is a power to impose sanctions, subject to judicial review, that are reasonably related to their remedial purpose. Although the Secretary's findings and choice of sanctions are entitled to due deference, they may be challenged on review as being unreasonable under the circumstances.
 
 
 40
 Our conclusion is reinforced by the closely analogous result in the recent case of Touche Ross & Co. v. SEC, supra, which upheld an SEC rule that permitted that agency to disbar from practice, either temporarily or permanently, any person found, after hearing, to lack the character or integrity to represent others before the SEC. Although the rule lacked express statutory authorization, it was justified as "an attempt by the SEC essentially to protect the integrity of its own processes." Id. at 581. We think much the same can be said of the Department of Agriculture here. Although West terms Touche Ross & Co. "wildly inapposite" because it involved licensed professionals, we think that the presence of a license in that case makes the result here follow a fortiori: if express authorization is not required to revoke or suspend a license to represent third parties before an agency, neither is it required to suspend an agency's provision of a service which is, unlike a license, not a legal prerequisite to dealing with third parties.
 
 
 41
 It may be, as the Secretary suggests, that a fair assessment of the statutory language precludes an excursion into legislative history: "when a statute on its face clearly covers certain activity, as in the instant case, we believe a court should accept the statute as written and avoid plunging into the murky waters of legislative history in an attempt to fathom whether Congress really intended to reach what the language of its statute Does reach." United States v. LeFaivre, 507 F.2d 1288, 1295 (4th Cir. 1974), Cert. denied, 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 762 (1975).[19] Because we consider here a question of implied authority, however, it may be appropriate to examine the legislative history for what guidance it may give. To negate the implied authority that thus far appears, however, we would require strong evidence in the legislative history of a contrary congressional intent.
 
 
 42
 The evidence that West supplies, by contrast, is inconclusive at best. It consists of two basic items. The first is a colloquy between Senator Richard B. Russell, the floor manager of the Senate Bill that became the Agricultural Marketing Act of 1946, and Senator Robert A. Taft, the Republican leader in the Senate. We have set out the colloquy below.[20]
 
 
 43
 From this exchange West would have us conclude that the Act contemplates no withdrawal of grading service. While as a logical matter the inference West urges is a permissible one, it is but one of several permissible inferences, and is by no means inevitable. We are mindful that "(t)he plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." Gemsco, Inc. v. Walling, 324 U.S. 244, 260, 65 S.Ct. 605, 614-615, 89 L.Ed. 921 (1945). Senator Russell's assurance that the Act would not "extend the power" of the Department of Agriculture and that it was "strictly a research bill" must be read against the plain language of section 1622(h), which expressly authorizes the Secretary to certify the grade of agricultural products. Perhaps Senator Russell thought the Secretary already had this power, since federal grading services had been available continuously since the 1920's. See 7 U.S.C.S. § 414 (repealed by 1955 amendment to section 1622(h)) and appropriation acts cited therein. Senator Russell's assurance that the Act would not "regulate production" may have meant simply that the Act would not regulate production directly, as does, for example, the Agricultural Marketing Agreement Act of 1937. Or perhaps Senator Russell was alluding to the voluntary nature of the Act; an act that provides a service only to those who want it is ordinarily not considered regulatory in nature. Of course, these speculations cannot be the basis for judicial holding. But neither can we rely on the speculations of West, when the language of the statute indicates a contrary result. We find the colloquy inconclusive.
 
 
 44
 The remainder of the 1946 legislative history only reinforces the Secretary's view. At hearings before the House Committee on Agriculture, which was considering the bill that would become the Act, the Secretary's administrators in the Production and Marketing Administration attested to the important consumer interest in "disinterested inspection and grade certification." Hearings on H.R. 6548 and H.R. 6692 Before The Committee on Agriculture of the House of Representatives, 79th Cong., 2d Sess. 145, 146, 185 (1946). Moreover, at the time of the Act, the Secretary had issued regulations that permitted him to refuse the grading service, authorized by appropriations acts, to persons whose misconduct jeopardized the integrity of the service. 1 Fed.Reg. 2126, 2127 (1936). Although congressional acquiescence by silence is not to be lightly presumed, E. g., TVA v. Hill, supra; SEC v. Sloane, supra, we think it sufficient in this case to remove any last vestige of doubt concerning the scope of the Act's grant of power.
 
 
 45
 West's second argument from legislative history focuses on the background to the 1955 amendment to section 1622(h), which provided criminal sanctions for falsifying official Department of Agriculture grading inspection certificates. West's argument is that the Secretary cannot be said to have power to withdraw services because Congress, in passing the 1955 amendment, specifically rejected a proposal that would have imposed criminal penalties for violations of the Secretary's regulations.
 
 
 46
 We reject this argument for three reasons. First, the proposed bill to which West refers would have criminally proscribed the violation of only those regulations that governed the possession or use of inspection certificates.[21] A bill that rejects criminal penalties for violations of regulations that govern a narrow class of activities does not impliedly reject administrative efforts to address other activities. Second, even had Congress rejected a broad proposal to impose criminal sanctions on violations of Any of the Secretary's regulations under the Act, the rejection of judicially imposed sanctions does not mean that Congress rejected the agency's power to correct abuses with less stringent means.
 
 
 47
 Finally, even had West been able to demonstrate some ambiguity as to the meaning of the statute, we would find considerable strength in the Secretary's argument that the legislative history of the 1955 amendment, far from negating the Secretary's power to ensure the integrity of meat grading through justified withdrawals, actually indicates that Congress approved of the practice. In 1955 the Secretary's regulation 53.12, which authorized withdrawal of grading services for misconduct, had been in place for about eight years. The Deputy Administrator for Marketing Services, who explained to the House Committee on Agriculture the purpose of the proposed criminal sanction, gave the Committee
 
 
 48
 a specific illustration. It is happening frequently with respect to the grading of meat. Federal meat grading has become an extremely important industry of merchandising, with the result that we are finding too frequently people or firms who are developing fictitious rollers and rolling that meat, implying that it has been officially graded. If we were servicing a firm under the Inspection Service and found them doing that, we could naturally withdraw any privileges of further use of this Service to them.
 
 
 49
 In that respect we can take care of that but we find too many instances where this type of activity is growing on the part of people who do not use the Service and our hands are tied with respect to imposing any penalties upon them.
 
 
 50
 Hearings on S. 1757 before the Committee on Agriculture of the House of Representatives, 84th Cong., 1st Sess. at 47-48 (1955). Although this statement could not be accorded much significance if the Secretary's withdrawal power were at odds with the statutory language or the general pattern of the statute, SEC v. Sloane, supra, 436 U.S. at 121, 98 S.Ct. 1702, 56 L.Ed.2d 148, such is not the case here. In the present case, we think that the prior existence of the regulation and the Department of Agriculture's assertion of the validity of that regulation in a congressional hearing on a related amendment triggers the presumption that Congress was generally aware of the Secretary's asserted withdrawal power. See cases cited Id. at 120, 98 S.Ct. 1702.
 
 
 51
 In summary, we uphold regulation 53.13(a), which permits the Secretary to withdraw grading services for misconduct in order to ensure the integrity of the grading service. The Secretary's interpretation of his power to enforce the substance of 53.13(a) has been followed, unchallenged, for at least thirty years. Moreover, the regulation was issued pursuant to express rule making authority and is reasonably designed to preserve the integrity and reliability of the grading system the Secretary is directed and authorized to administer. Thus, although not expressly authorized, the regulation enjoys an especially strong presumption of validity which West has not rebutted. The regulation is not inconsistent either with an express statutory provision or with the agriculture laws taken as a whole. Finally, the legislative history tends to support rather than strongly oppose the view that the regulations are authorized by Congress.
 
 
 52
 We therefore affirm the district court in its denial of injunctive relief.
 
 
 53
 ROSS, Circuit Judge, concurring.
 
 
 54
 I concur in the opinion of Judge Stephenson. However, in my opinion the regulations should provide that a limit be placed upon the length of time that the penalties will be enforced, or at least set forth some guidelines which would give the Secretary authority to refuse to impose a time limit under specified conditions.
 
 
 
 [1]
 The Honorable Robert V. Denney, United States District Judge for the District of Nebraska
 
 
 [2]
 7 U.S.C. § 1622(h). For a brief history of federal beef grading, see Independent Meat Packers Ass'n v. Butz, 526 F.2d 228, 232-33 (8th Cir. 1975), Cert. denied, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976)
 According to West, he is consultant to two meat packing companies, American Beef Packers, Inc. and Union Beef Packing Company, both located in Omaha, Nebraska. In 1973-74 West was president of American Beef Packers. West and the companies for which he works also receive federal meat inspection services, which are not involved in this case.
 
 
 [3]
 The complaint also named American Beef Packers, which is not a party to this action. To simplify, we will refer to the parties as "West" and "the Secretary of Agriculture" (or "the Secretary")
 
 
 [4]
 This regulation has been redesignated during the pendency of this action and now appears at 7 C.F.R. § 2853.11(a) (1979). For purposes of convenience, we will continue to refer to it as section 53.13(a). Its relevant portion reads:
 Denial or withdrawal of service.
 (a) For misconduct (1) Bases for denial or withdrawal. * * *
 (T)he benefits of the service may be (withdrawn) * * * from any person who * * * (ii) has given or attempted to give, as a loan or for any other purpose, any money, favor, or other thing of value, to any employee of the Department authorized to perform any function under the regulations * * *.
 Withdrawal normally occurs pursuant to an administrative hearing. See 7 C.F.R. § 2853.11(a)(2), Citing 7 C.F.R. Part 2850.
 
 
 [5]
 Between the filing of the administrative complaint in November 1977 and West's suit for injunctive relief in February 1979, West had twice sought to have the Secretary's proceedings enjoined on grounds unrelated to this action. West filed his answer to the administrative complaint on November 9, 1978. During oral argument we were advised that no hearing has yet been held
 
 
 [6]
 Because the administrative hearing is still at the prehearing stage, West has exhausted no administrative remedy. The briefs of both parties reflect the misapprehension that the district court required exhaustion of administrative remedies on the question of agency jurisdiction. In fact, the district court reached this question in upholding the regulation, and in doing so implicitly held exhaustion was not required as to this question. Had the court wanted to require exhaustion, it would have declined to consider the question of agency jurisdiction until administrative remedies on that question were exhausted. See, e. g., Bolger v. Marshall, 90 U.S.App.D.C. 30, 32, 193 F.2d 37, 39 (D.C.Cir.1951) (resolution of exhaustion issue a prerequisite to entertaining the merits). The court did conclude that West "(shall be required) to exhaust his administrative remedies." The opinion as a whole, however, reveals that the court was requiring West to exhaust administrative remedies on the Remaining questions, including the question whether withdrawal of meat grading and acceptance services would be appropriate in his particular case. It may be that the court pretermitted the exhaustion issue with respect to agency jurisdiction because it thought it was inadequately presented in the record and thought the merits clearly against the plaintiff. See Adams v. Vance, 570 F.2d 950, 954 n.7 (D.C.Cir.1978) and cases cited therein
 
 
 [7]
 The Secretary points out that the administrative pleadings suggest three arguably specialized factual questions that bear on the jurisdictional issue presented: (1) whether West bribed a federal meat grader; (2) whether bribing a federal meat grader would justify withdrawal of meat grading services under 7 U.S.C. § 1622(h) and regulation 7 C.F.R. § 53.13(a); and (3) whether meat grading services facilitate the marketing of meat and livestock
 None of these disputes is germane to agency jurisdiction. The first two disputes concern whether West has committed an instance of misconduct that might justify application of regulation 53.13; they are irrelevant to the threshold question whether 53.13 validly grants the Secretary any authority at all. The third dispute, although presumably well-suited for initial agency determination, is also irrelevant to the jurisdictional question. That question does not turn on whether the regulation will actually promote the statute's purposes, one of which is the marketing of meat and livestock, but, according to the standard the Secretary himself would urge, whether the regulation is "reasonably related" to the statute's purposes. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).
 
 
 [8]
 See note 9 Infra. Of course, that there is an important general question involved may be a factor indicating the appropriateness of early judicial review. See L. Jaffe, Judicial Control of Administrative Action 435 (1965)
 
 
 [9]
 The Secretary informs us that federal grading services are provided, subject to removal for misconduct, for a vast variety of fresh and canned produce, including asparagus, white potatoes, rabbits, and watermelons. See, e. g., 7 C.F.R. § 2859.160 (1979) (permitting administrator to withdraw egg inspection services from persons convicted within prior ten years of felony for mislabelling food). Invalidation of regulation 53.13(a) by the Secretary thus seems unlikely in that it would logically require invalidation of a large number of regulations permitting withdrawal of grading services for misconduct, with a presumably dramatic effect on the Secretary's grading program
 
 
 [10]
 On oral argument, West's counsel conceded, and the Secretary's counsel assured us, that West would continue to receive meat grading services until final agency action
 
 
 [11]
 Of course, the concepts of irreparable injury and inadequate remedy are not wholly distinct. The instances cited above as examples of irreparable harm could also be characterized as examples of inadequate remedy; the remedy was inadequate to prevent irreparable harm. Generally, however, the litigant faces irreparable injury if judicial nonintervention results in harm of an extraordinary nature, and the litigant faces an inadequate remedy, even if his harm is not out of the ordinary, if the agency's limited power to grant relief or the agency's hostile attitude makes it impossible or highly improbable that the litigant will obtain the relief he seeks. See K. Davis, Administrative Law Treatise § 20.07 (1958)
 
 
 [12]
 The Second Circuit appeared to use irreparable injury to include both irreparable injury and inadequate remedy as we have used those terms. Recent opinions of the Supreme Court might be read to indicate that irreparable injury is absolutely required if exhaustion is to be avoided. E. g., Renegotiation Bd. v. Bannercraft Clothing Co., 415 U.S. 1, 23-26, 94 S.Ct. 1028, 39 L.Ed.2d 132 (1974); See Moore v. East Cleveland, 431 U.S. 494, 522-29, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) (Burger, C. J., dissenting). We suspect that the Supreme Court would take a flexible approach, however, if squarely confronted with the issue, in light of its opinions in McKart and McGee
 We must ask, then, whether there is in this case a governmental interest compelling enough to outweigh the severe burden placed on (the individual). Even if there is no such compelling interest when (this individual's) case is viewed in isolation, we must also ask whether allowing all similarly situated (individuals) to by-pass administrative * * * procedures would seriously impair the (agency's) ability to perform its functions.
 McKart v. United States, supra, 395 U.S. at 197, 89 S.Ct. at 1664 (1969).
 
 
 [13]
 To our knowledge, this is the first challenge to its validity. The Secretary claims that judicial decisions upholding agency withdrawal of grading services have necessarily held that the Secretary is authorized to withdraw them. The Secretary cites but one example, however, Arrow Meat Co. v. Freeman, 261 F.Supp. 622 (D.Ore.1966). Agency jurisdiction was not challenged in Arrow, and we are not aware of the other judicial decisions to which the Secretary alludes
 
 
 [14]
 Running parallel to this argument is West's contention that withdrawal of services for misconduct is a penal sanction, and as such can be authorized only by specific statutory language. Accepting that in this case the Secretary has no punitive authority, we nevertheless conclude that the sanction in question is not penal but remedial. Whether an administrative denial of benefits is penal turns on its purpose. See generally, e. g., Clark, Civil and Criminal Penalties and Forfeitures: A Framework of Constitutional Analysis, 60 Minn.L.Rev. 379, 406-07, 485-86 (1976). The evident purpose of regulation 53.13(a) is not to stigmatize or punish wrongdoers; it is to prevent misconduct that would jeopardize the integrity of and public confidence in the federal product grading system. Of course, if in a particular case the sanction of withdrawal is not reasonably related to the regulation's authorized remedial purpose, that particular application of the regulation may be struck down as punitive on review from an agency order. See, e. g., Beck v. SEC, 430 F.2d 673 (6th Cir. 1970). West cannot plausibly contend, however, that the regulation is punitive on its face
 
 
 [15]
 Two additional reasons for the Court's invalidation of the SEC's practice of indefinitely concatenating suspension orders were (1) the express language of the statute, which authorizes suspensions "for a period not exceeding ten days," 436 U.S. at 110-12, 98 S.Ct. at 1708, and (2) the inconsistency of the SEC's interpretation with other provisions in the statute, which authorize suspensions, after a hearing, for only limited periods of time. Id. at 112-14, 98 S.Ct. 1702
 The first reason explains three of the cases on which West principally relies, Zuber v. Allen, 396 U.S. 168, 90 S.Ct. 314, 24 L.Ed.2d 345 (1969); Lehigh Valley Coop. v. United States, 370 U.S. 76, 82 S.Ct. 1168, 8 L.Ed.2d 345 (1962); Brannan v. Stark, 342 U.S. 451, 72 S.Ct. 433, 96 L.Ed. 497 (1952). All three cases involved administrative adjustment to minimum milk prices that ran counter to an express directive of the Agricultural Marketing Agreement Act of 1937. Here, by contrast, there is no showing that the challenged regulation is inconsistent with any express statutory mandate. The second reason, inconsistency of the challenged regulation with the statutory scheme, explains another set of cases relied upon by West. E. g., Conway City Farmers Ass'n v. United States, 588 F.2d 592, 598-99 (8th Cir. 1978); Midwest Video Corp. v. FCC, 571 F.2d 1025, 1040-42 (8th Cir. 1978), Aff'd, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).
 
 
 [16]
 We intimate no view on the Secretary's authority to withdraw grading services summarily. We note that 7 C.F.R. § 2850.40 purports to grant him that authority
 
 
 [17]
 West refers to several statutes, E. g., 7 U.S.C. §§ 203, 204 (relating to Packers and Stockyards Act of 1921) (market agencies and stockyard dealers must register; registrant may be suspended, after hearing, for "reasonable specified time"); 7 U.S.C. § 246 (Warehouse Act of 1916) (suspension or revocation, after hearing, of warehouseman's license); 7 U.S.C. § 499h(a) (Perishable Commodities Act) (up to ninety days suspension, after hearing, of license of commissioner merchant, dealer, or broker, or revocation of license, after hearing, if violation "flagrant or repeated"). As the parentheticals indicate, West misreads the statutes in claiming that each congressional grant of the power to suspend contains "specific criteria" as to the "length and duration of sanction."
 
 
 [18]
 We concede that, as a practical matter, withdrawal of meat grading services may impair one's ability to do business. We reiterate, however, that the Secretary in this case is asserting the power to withdraw only after a hearing to determine whether a suspension of meat grading services is necessary to ensure the integrity of the service
 
 
 [19]
 The district court ignored the legislative history, presumably because it found the statutory language sufficiently plain. See TVA v. Hill, 437 U.S. 153, 184 n.29, 98 S.Ct. 437, 5 L.Ed.2d 117 (1978)
 
 
 [20]
 Mr. Taft. Mr. President, will the Senator yield?
 Mr. Russell. I yield.
 Mr. Taft. Does this Bill in any way extend the Power of the Department of Agriculture * * * or is it strictly confined to research?
 Mr. Russell. It does Not in any wise Extend the Power of the Department of Agriculture or any of its subdivisions.
 Mr. Taft. Either to buy or sell or Regulate production?
 Mr. Russell. It does not to the slightest degree make any such provision. It provides wholly for research.
 Mr. Taft. There are a couple of very general statements contained in the Bill which I had not read with care, so I could not judge whether the language was sufficiently broad to cover other activities.
 Mr. Russell. It is strictly a research Bill.
 
 
 [92]
 Congressional Record, part 8, 79th Cong., 2d Sess. at 10, 370 et seq. (July 29, 1946). We have retained the emphases supplied by West
 
 
 [21]
 The bill would have imposed penal sanctions on any person who violated "any provision of any regulation promulgated by the Secretary of Agriculture to govern the possession or use of certificates, memorandums, marks, or other identifications with respect to inspection, class, grade, quality, size, quantity or condition or devices for making such marks or identifications, issued or authorized under this Act."