GODBOLD, Chief Judge:
In this appeal we consider whether the U.S. Department of Agriculture (USDA) has inherent authority to impose civil money penalties against Gold Kist relating to marketing and handling peanuts when Congress has not expressly provided them. We conclude that the agency lacked such authority and reverse the district court’s finding of inherent authority. We remand to the district court for consideration of Gold Kist’s request for attorney’s fees under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (Supp. V 1981) (EAJA).
I. Facts and procedural history
This case arises from the government’s peanut price support program. The program was first established under the Agricultural Adjustment Act of 1938, 7 U.S.C. § 1281 et seq. Marketing quotas were added to the Act in 1941. Under the current two-tier system, peanuts fall into one of two price categories, “quota” or “additional.” Quota peanuts are those produced under a quota and allotment granted the farmer under the federal peanut program. Additional peanuts are those grown in addition to a farmer’s allotment and quota or those grown by a farmer with no allotment and quota.
Until 1977 only quota peanuts could be used for domestic consumption. Additional peanuts had to be exported or crushed into oil or peanut meal. The 1977 Amendments to the Act allowed the introduction of additional peanuts into the domestic market. To the extent that a handler used quota peanuts for export or crushing into oil or meal it would receive substitution credits enabling it to introduce additional peanuts into the domestic market.
Congress established this change in the law by adding subsections (g), (h) and (i) to 7 U.S.C. § 1359, which provide:
(g) Upon a finding by the Secretary that the peanuts marketed from any crop for domestic edible use by a handler are larger in quantity or higher in grade or quality than the peanuts that could reasonably be produced from the quantity of peanuts having the grade, kernel con *346 tent, and quality of the quota peanuts acquired by such handler from such crop for such marketing, such handler shall be subject to a penalty equal to 120 per centum of the loan level for quota peanuts on the peanuts which the Secretary determines are in excess of the quantity, grade, or quality of the peanuts that could reasonably have been produced from the peanuts so acquired.
(h) The Secretary shall require that the handling and disposal of additional peanuts be supervised by agents of the Secretary or by area marketing associations designated pursuant to section 1445c(c) of this title. Quota and additional peanuts of like type and segregation or quality may, under regulations prescribed by the Secretary, be commingled and exchanged on a dollar value basis to facilitate warehousing, handling, and marketing.
(i) Handlers may, under regulations prescribed by the Secretary, contract with producers for the purchase of additional peanuts for crushing, export, or both. All such contracts shall be completed and submitted to the Secretary (or if designated by the Secretary, the area association) for approval prior to June 15 of the year in which the crop is produced. Following the 1977 amendments to the
Act the Secretary proposed and published rules governing additional peanuts. The rules concerning quota and additional peanuts were codified in 7 C.F.R. Part 1446, with the basic provisions governing additional peanuts at 7 C.F.R. §§ 1446.8, 1446.-9.
Section 1446.8 provided that all additional peanuts must be disposed of by crushing or export except when, under section 1446.-9(d), the substitution of additional peanuts for quota peanuts was allowed. Section 1446.8(c) provided that all additional peanuts must be disposed of by August 31 of the year following the year in which the peanuts were grown unless an extension was obtained by August 31, and no extension could be granted past November 30 of that year. Failure to comply with program requirements would result in a penalty of 120% of the quota support level. 7 C.F.R. § 1446.8(d). However, the regulations permitted a reduction in the penalty to 40% of the quota support level if the marketing errors were unintentional. 7 C.F.R. §§ 1446.8(d)(1), 1446.8(e).
Section 1446.9 governed the supervision and handling of additional peanuts. Section 1446.9(i) required that the handling of all additional peanuts be done by July 31 of the year following the year in which the peanuts were grown, unless prior approval of a later date was authorized by the area marketing association. Section 1446.9(j)(6) provided that failure to dispose of additional peanuts by final date for exportation, failure to obtain supervision from the association, or failure to handle properly the additional peanuts constituted noncompliance with the regulations and subjected the handler to a penalty of 120% of market quota rate, unless a reduced penalty was allowed under Section 1446.8.
Section 1446.5(a)(9) required that all contracts between producers and handlers contain a statement that the handler agrees to export or crush the peanuts in accordance with Section 1446 and that failure of the handler to do so would subject it to a penalty as provided for in the regulations.
Gold Kist made three clerical errors in its handling of additional peanuts in 1980. At its Ashburn, Georgia plant the company failed to request substitution or to export or crush additional peanuts on or before August 31, 1980, thus violating 7 C.F.R. §§ 1446.8(c), 1446.9(d). At its Plains, Georgia plant, between June 17 and August 4, 1980, Gold Kist shipped into the domestic market 12 lots of additional peanuts that had been mistakenly coded as domestic peanuts. Because the company believed that the peanuts were quota peanuts, it failed to request and obtain substitution permission before August 31, 1980, thereby violating 7 C.F.R. § 1446.9(d). At its Comyn, Texas plant the company, prior to August 31, 1980, shipped into the domestic market three lots of additional peanuts mistakenly coded as quota peanuts. Again, because of *347 Gold Kist’s mistaken belief that the peanuts were quota peanuts, it failed to seek and obtain substitution permission before August 31, 1980 in violation of 7 C.F.R. § 1446.9(d).
Upon realizing its errors Gold Kist contacted the USDA requesting belated permission to substitute additional peanuts for quota peanuts (i.e. the additional peanuts already erroneously shipped into the domestic market as quota peanuts) and permission to substitute additional peanuts for quota peanuts or export additional peanuts after the August 31 deadline (the Ashburn peanuts). At the time of the request Gold Kist had ample substitution credits for the additional peanuts from all three plants.
Gold Kist was not given permission to substitute or export and was fined by the Department for its violations of the regulations. The initial letter imposed fines of $217,785.91. Gold Kist appealed to the Deputy Administrator, who reduced the fines to $72,662.10. Gold Kist then filed a consolidated appeal. The Deputy Administrator further reduced the fines to $70,-634.26. This decision constituted the final decision of the Department.
Gold Kist then filed a complaint for declaratory and injunctive relief in district court. The district court declined to stay the government’s collection of the marketing penalties, and this court affirmed the denial of the stay. Both sides then moved for summary judgment.
The district court determined that even though the marketing penalties assessed by the USDA were not specifically authorized by statute, the agency had the power to impose such penalties as a necessary concomitant of the power to regulate. The court determined that the company had violated the regulations.[1] The court did not discuss Gold Kist’s request for attorney’s fees, presumably because Gold Kist was not a prevailing party below.
II. Agency authority to impose civil monetary penalties not expressly authorized by statute
Of the three subsections of section 1359 added in 1977 only subsection (g) specifically provides for a marketing penalty. Subsection (g) covers the introduction into the domestic market of peanuts in greater number or higher grade than the quota peanuts acquired by the handler. Subsections (h) and (i), on the other hand, concern the handling and disposal of additional peanuts.
Gold Kist’s three violations all concern the handling and disposition of additional peanuts, (h) and (i) violations. The Deputy Administrator concluded that Gold Kist had violated 7 C.F.R. § 1446.9(d) (substitution of additional peanuts for quota peanuts in the domestic market without prior notification and approval of the supervising association) and 7 C.F.R. §§ 1446.8(c), 1446.9(d) (request for substitution after August 31).
Gold Kist asserts that the agency had no authority to issue regulations providing for marketing penalties for violations of 7 U.S.C. §§ 1359(h), (i) because the statute does not specifically so provide. The agency argues that it has plenary authority to set the conditions under which additional peanuts are handled and that this authority necessarily encompasses the power to assess monetary penalties.
There are two conflicting lines of cases relevant to this issue of the agency’s power. One line holds that
[t]he law is settled that “penal statutes are to be construed strictly,” ..., and that one “is not to be subjected to a penalty unless the words of the statute plainly impose it____”
Commissioner v. Acker, 361 U.S. 87, 91, 80 S.Ct. 144, 147, 4 L.Ed.2d 127 (1959) (citations omitted). The other strand of precedent provides that
[wjhere the empowering provision of a statute states simply that the agency *348 may “make ... such rules and regulations as may be necessary to carry out the provisions of this Act,” we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is “reasonably related to the purposes of the enabling legislation.”
Mourning v. Family Publications Service, Inc., 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (citations and footnote omitted).
Each party to this appeal cites numerous cases following the line of precedent favoring its position; few of these cases discuss the opposing line of authority. One case relied on by the Secretary, West v. Bergland, 611 F.2d 710 (8th Cir.1979), cert, denied, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980), does discuss the rule of strict construction of penal statutes, although the court found that the agency had power to impose sanctions (withdrawal of meat grading and acceptance services) reasonably related to the purpose of the enabling legislation. 611 F.2d at 725. The West court acknowledged the contrary line of cases but concluded that the sanction involved was remedial, not penal. Id. at 722 n. 14. While not expressly stated by the court, the language of the footnote suggests that if the court had found the sanction penal the court would have required specific statutory authority. See id.
The Fifth Circuit has also distinguished between imposition of sanctions and imposition of penalties.
The power to disqualify on account of fraud is inherent in the effective administration of such a program, and therefore is expressly within the authority given to the Secretary in 7 U.S.C. § 2013(c) [to issue “such regulations, not inconsistent with this chapter, as he deems necessary or appropriate for the effective and efficient administration of the food stamp program”]. That Congress provided specific criminal penalties for dealing with fraud does not mean that Congress meant to prohibit utilization of the reasonable administrative device of termination for fraud. There is no requirement that such inherent administrative powers be prescribed with the specificity required for penalty provisions____
Jacquet v. Westerfield, 569 F.2d 1339, 1345 (5th Cir.1978) (citations omitted).
To resolve these conflicting lines of precedent we hold that the statute must plainly establish a penal sanction in order for the agency to have authority to impose a penalty but that an agency has broad administrative powers to impose administrative sanctions that are not penalties as long as the sanctions are reasonably related to the purpose of the enabling statute. “ ‘Penal’ means punishable; inflicting a punishment; constituting a penalty; or relating to a-penalty.” Black’s Law Dictionary 1289 (4th ed. 1957). The dictionary also defines “penal laws” as “[t]hose which prohibit an act and impose a penalty for the commission of it____ Strictly and properly speaking, a penal law is one imposing a penalty or punishment (and properly a pecuniary fine or mulct) for some offense of a public nature or wrong committed against the state____” Id. at 1290 (citations omitted). We conclude the fines imposed on Gold Kist were penalties, not administrative sanctions.
While the majority of cases cited by Gold Kist involve criminal statutes, the Acker case concerned the imposition of a civil penalty for filing of a substantial underestimate of tax. Acker indicates the rule of strict construction of penal statutes applies to civil as well as criminal statutes. Because section 1359(h) and (i) do not plainly impose a marketing penalty on handlers who fail to export, crush, or request substitution by the required date, the agency had no authority to impose such a penalty.
Besides relying on the Secretary’s inherent authority to impose administrative sanctions, the Secretary also asserts that Gold Kist’s introduction into the domestic market of additional peanuts without first obtaining substitution credits is a violation of section 1359(g), which specifically authorizes imposition of marketing penalties. Assuming that Gold Kist was charged with having violated § 1359(g) or its companion *349 regulations, 7 C.F.R. §§ 1446.8(a), 1446.9(d), both of which involve the handling and disposition of additional peanuts, it did not commit a violation thereof.
The Secretary further argues that when Congress in 1981 specifically provided marketing penalties for violations of sections 1359(h) and (i), (renumbered as (i) and (j) respectively), it ratified the agency’s interpretation of the 1979 statute as authorizing such penalties. The Secretary cites to the House Conference Report which states that
[t]he Conference substitute adopts the Senate provision, with an amendment to make clear that, as under current law, failure by a handler to comply with regulations issued by the Secretary governing the disposition and handling of additional peanuts shall subject the handler to penalty at the rate of 120 percent of the loan level for quota peanuts.
H.Conf.Rep. No. 377, 97th Cong., 1st Sess. 179, reprinted in 1981 U.S.Code Cong. & Ad.News 1965, 2276. However,
congressional re-enactment of a statute, even without any apparent knowledge of a particular regulation, can “strengthen to some extent” the regulation’s claim to validity, but re-enactment cannot save a regulation which “contradict[s] the requirements” of the statute itself. When a regulation conflicts with the statute, the fact of subsequent re-enactment “is immaterial, for Congress could not add to or expand [the] statute by impliedly approving the regulation.” Commissioner v. Acker, 361 U.S. 87, 93, 80 S.Ct. 144, 148, 4 L.Ed.2d 127 (1959).
Leary v. U.S., 395 U.S. 6, 24-25, 89 S.Ct. 1532, 1542, 23 L.Ed.2d 57 (1969).
We therefore reverse the district court’s finding that USDA possessed inherent authority to impose the marketing penalties at issue here.
III. Attorney’s fees under the Equal Access to Justice Act
Because the district court held against Gold Kist, it did not rule on the company’s motion for attorney’s fees under the EAJA. On appeal Gold Kist asserts that this court should find it entitled to attorney’s fees and remand to the district court for a determination of amount. The agency, on the other hand, argues that the company’s request is premature because Gold Kist has not filed an application for attorney’s fees and that the propriety of awarding fees should be determined by the district court in the first instance.
28 U.S.C. § 2412(d)(1)(B) (Supp. V 1981) provides that a party seeking an award
shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought.
Gold Kist filed no application below; of course, there was no final judgment below in its favor. At least two circuit courts have construed “final judgment” to mean final judgment in the district court. Guthrie v. Schweiker, 718 F.2d 104, 106 (4th Cir.1983); McQuiston v. March, 707 F.2d 1082, 1085 (9th Cir.1983). While we agree with this construction when the non-government party prevails below, to require a losing party below to file such an application would be senseless. No other circuit court has yet considered the issue in this context. We conclude that when the non-government party loses in district court but prevails on appeal, it must file its application for fees under the EAJA within 30 days of the judgment of the appellate court. Cf Rawlins v. United States, 686 F.2d 903, 914, 210 Ct.Cl. 672 (1982) (remanding to trial division to consider request for attorney’s fees if litigant files timely application). Of course, no such application has yet been filed in this case. Furthermore, we conclude that a determination of whether a litigant is entitled to fees under the EAJA is best made in the first instance by the district court. Cf. Spencer v. N.L.R.B., 712 F.2d 539, 563-64 (D.C.Cir.1983) (Recognizing that some determinations under EAJA are questions of fact). We therefore remand this case to the district court for consideration of Gold Kist’s motion for attorney’s fees if Gold *350 Kist submits a timely application for such fees, which should be made within 30 days of the district court’s order making the judgment of this court the order of the district court.
REVERSED and REMANDED.

. Because of our ruling on the question of the agency’s authority, we do not address the district court’s rulings on Gold Kist’s claims under the Administrative Procedure Act, equal protection clause and due process clause.