Clyde JACQUET et al.,
Plaintiffs-Appellants,

v.

Roy E. WESTERFIELD et al.,
Defendants-Appellees.

No. 75–3828.

United States Court of Appeals,
Fifth Circuit.

March 24, 1978.

Jack Mark Stolier, New Orleans, La., Henry A. Freedman, Howard L. Zwickel, NLSP Center on Social Welfare Policy & Law, Inc., New York City, for plaintiffs-appellants.

Raymond L. Smart, Terry F. Hessick, La. Dept. of Public Welfare, Legal Div., William J. Guste, Jr., Atty. Gen., Baton Rouge, La., Gerald J. Gallinghouse, U. S. Atty., New Orleans, La., William Kanter, Atty., Rex E. Lee, Asst. Atty. Gen., Allen H. Sachsel, Dept. of Justice, Washington, D. C., for defendants-appellees.

Before WISDOM, GODBOLD and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

Plaintiffs brought this class action challenging two policies of the welfare department of the state of Louisiana. The first policy, authorized by regulations of the Department of Health, Education, and Welfare (HEW), codified at 45 C.F.R. § 233.-20(a)(12)(i)(A)(2) (1976), allows the reduction of the current assistance grant under the Aid to Families with Dependent Children (AFDC) program, irrespective of current income or resources, in order to recoup prior overpayments resulting from a willful withholding of information by the head of the household concerning income or resources. The second policy, authorized by regulations of the Department of Agricul-ture, codified at 7 C.F.R. § 271.7(e) (1977), allows the temporary disqualification from the Food Stamp program of a household found to have acquired coupons by fraud. The district court, finding the Louisiana policies to be authorized by regulations which, in turn, were valid exercises of the authority granted to the Departments of HEW and Agriculture, denied plaintiffs' application for preliminary and permanent injunctive relief. We affirm.

I. The AFDC Recoupment Regulation

[1] Title IV A of the Social Security Act, 42 U.S.C.A. § 601 *et seq.*, is designed to provide aid in the form of cash assistance and social services to needy, dependent children and their caretaker relatives. 42 U.S.C.A. § 601. The program is based on a scheme of cooperative federalism. It is financed in large part by federal funds on a matching basis, but its administration is entrusted to the states. *See generally King v. Smith,* 392 U.S. 309, 316–17, 88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118 (1968).

A state desiring to participate in the program must submit for HEW approval a plan conforming to the Act and the implementing regulations. As a yardstick for measuring eligibility for assistance and the amount of assistance, each state plan "must specify a statewide standard of need, which is the amount deemed necessary by the State to maintain a hypothetical family at a subsistence level." *Shea v. Vialpando,* 416 U.S. 251, 253, 94 S.Ct. 1746, 1750, 40 L.Ed.2d 120 (1974). State plans must also contain a determination of the level of assistance their plans will meet. *Rosado v. Wyman,* 397 U.S. 397, 408, 90 S.Ct. 1207, 1216, 25 L.Ed.2d 442 (1970). This level of benefits is the percentage of a covered family's standard of need which the state chooses to pay. *See National Welfare Rights Organization v. Mathews,* 174 U.S.App.D.C. 410, 414–15, 533 F.2d 637, 641–42 (1976). At the time of this suit the Louisiana plan was designed to assure that an eligible household would receive 60% of its specified standard of need. If the income and resources of the family provided less than 60% of the standard of

need, the family was entitled to an assistance grant in the amount necessary to bring them up to the 60% level. A similar system of computing the level of benefits to be given the welfare recipient was approved in *Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972).

HEW, the agency charged with administering the AFDC program, has the authority to promulgate rules and regulations, not inconsistent with the Act, as may be necessary to the efficient administration of the program. 42 U.S.C.A. § 1302. Pursuant to this authority, HEW promulgated the recoupment regulation in issue here:

The State may not recoup any overpayment previously made to a recipient: (1) Unless the recipient has income or resources exclusive of the current assistance payment currently available in the amount by which the agency proposes to reduce payments: except that, (2) *Where such overpayments were occasioned or caused by the recipient's willful withholding of information concerning his income, resources or other circumstances which may affect the amount of payment, the State may recoup prior overpayments from current assistance grants irrespective of current income or resources.*

45 C.F.R. § 233.20(a)(12)(i)(A) (1976). The regulations also contain this limitation on a state's power to recoup from current assistance grants:

If recoupments are made from current assistance payments, the State shall, on a case-by-case basis, limit the proportion of such payments that may be deducted in each case, so as not to cause undue hardship on recipients.

45 C.F.R. § 233.20(a)(12)(i)(*f*) (1976). Louisiana's recoupment policy complies with the regulations. The lawfulness of the policy depends upon the validity of this regulatory scheme.

The standard of review to be applied in evaluating the regulations is lenient due to the deference accorded to an administrator's interpretation of the statutory scheme he carries out. The regulations are within the scope of the broad grant of power given to the Secretary of HEW by 42 U.S.C.A. § 1302 if they are "reasonably related to the purposes of the enabling legislation" and if they are not inconsistent with the Act. *Johnson's Professional Nursing Home v. Weinberger,* 490 F.2d 841, 844 (5th Cir. 1974).

In arguing that the recoupment regulation is contrary to the purposes of the Act, plaintiffs focus our attention on the effect of recoupment on the needy, dependent children, the protection of whom is the "paramount goal of AFDC." *King v. Smith,* 392 U.S. 309, 325, 88 S.Ct. 2128, 2137, 20 L.Ed.2d 1118 (1968). The reality of public welfare is the necessity of current payments for current needs, and depriving these children of their current needs because of the fraud of their caretaker relatives violates the policy underlying the AFDC program.

Plaintiffs err in asserting that recoupment violates the purposes of AFDC. As the statute itself states, the purpose of AFDC is to provide assistance to needy and dependent children "as far as practicable under the conditions in [each] state." 42 U.S.C.A. § 601. This proviso indicates that Congress realized state resources are not unlimited. *Dandridge v. Williams,* 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L.Ed.2d 491 (1970). If some welfare recipients obtain more than their rightful share of these finite resources through fraud, it is mathematically certain that other needy, dependent children whose families accurately report their income and resources must be affected either by across-the-board reductions of the level of assistance or by the state's inability to provide an increased level of benefits. The recoupment regulations, an administrative tool designed to assure a fair distribution of the state's limited funds, are reasonably related to the goal of evenly assisting needy children to the state-determined level. Families from whom recoupment is made may suffer some hardships as a result of the reduction of their current grants, especially in a state like Louisiana where the AFDC program cannot provide

the recipients' full standard of need. However, the fraud which enabled them to gain a share of the benefits to which others were entitled may properly cause this share to be returned. The regulation which limits recoupment to an amount that will not cause undue hardship, 45 C.F.R. 233.20(a)(12)(i)(*f*), reasonably assures that needy children will not be left entirely unprotected from the effects of their caretakers' wrongdoing.

Recoupment also serves another purpose of the Act: the desire of Congress to keep dependent children within a family unit. *See Dandridge v. Williams,* 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The alternative remedy of criminal prosecutions for welfare fraud, suggested by plaintiffs, could result in the jailing of a needy child's proper caretaker relative. However, our initial decision is not rested upon such a policy choice. *See Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 1729, 32 L.Ed.2d 285 (1972). Rather, it is based on the determination that the regulations have a reasonable relationship to the purposes of the enabling legislation.

Plaintiffs also urge that the regulations are inconsistent with specific provisions of the Act. We begin our analysis of this issue by noting that no provision of Title IV A of the Social Security Act either expressly authorizes or forbids recoupment of prior overpayments from current assistance payments. *See Swasey v. Whalen,* 562 F.2d 831, 833 (1st Cir. 1977). Plaintiffs argue that congressional silence should be read as prohibiting recoupment in the AFDC program since Congress explicitly provided for recovery of overpayments by grant reductions in other welfare programs. *See* 42 U.S.C.A. § 404(a) (allowing recoupment by grant reductions in the Old Age, Survivors, and Disability Insurance program); *Bradford v. Juras,* 331 F.Supp. 167 (D.Or.1971). Defendants argue that congressional silence with respect to recoupment under the circumstances of this case, when HEW policy or regulations have allowed such recoupment at least since 1968 and arguably since 1951, indicates Congress' approval of the regulations. *See Jackson v. Weinberger,* 407 F.Supp. 792 (W.D.N.Y.1976). Given the inconclusive nature of the legislative history of recoupment, we decline to infer that Congress' silence indicates approval or disapproval.

No express statutory authorization is required to permit the government to recoup monies wrongfully paid. As we have held, the government has a common law right of recoupment. *Mt. Sinai Hospital v. Weinberger,* 517 F.2d 329 (5th Cir. 1975). In addition, the recoupment regulations function in at least two ways to further the efficient administration of the program, thus bringing them within the scope of HEW's broad statutory authority. First, the regulation deters fraud by eliminating any incentive to inaccurate reporting of income and resources. Second, the regulation enables the state to recover overpayments in order to maintain the fiscal integrity of its program. Since HEW's statutory authority extends only to regulations necessary to the efficient administration of the program that are not inconsistent with the Act, the issue narrows to whether the method of recoupment employed here—recoupment by reduction of current benefits without regard to current income and resources when the recipient has received an overpayment by willfully withholding pertinent information—is inconsistent with or prohibited by the Act.

Plaintiffs argue that the recoupment regulation is inconsistent with 42 U.S.C.A. § 602(a)(7). That section requires the state agency, in determining need, to "take into consideration any other income and resources of any child or relative claiming aid to families with dependent children." Thus an individual family's need is determined by subtracting from its standard of need the available income and resources of that family. *See Swasey v. Whalen,* 562 F.2d 831, 835 (1st Cir. 1977). The "income and resources" to be taken into consideration in determining need and the amount of the assistance payment are "net income available for current use and currently available resources." 45 C.F.R. § 233.20(a)(3)(ii)(D) (1976).

In a series of cases involving the presence in the welfare household of an able-bodied male who had no legal obligation to support the child, the Supreme Court has made clear that a state cannot *assume* the availability of that male's income in determining the family's eligibility for and amount of AFDC assistance, without proof that the income was actually being contributed for the child's support. *Van Lare v. Hurley,* 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975); *Lewis v. Martin,* 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970); *King v. Smith,* 392 U.S. 309, 319 n. 16, 88 S.Ct. 2128, 2134, 20 L.Ed.2d 1118 (1968). Plaintiffs argue that the reduction of current grants pursuant to the recoupment regulation likewise is based on an unlawful assumption that the past overpayment is currently available to meet current needs. This assumption is said to be precluded by the currently available income and resources rule of § 602(a)(7).

This argument persuaded the court in *National Welfare Rights Organization v. Weinberger,* 377 F.Supp. 861 (D.D.C.1974), to invalidate the predecessor of the recoupment regulation in issue here insofar as it permitted recoupment from current benefits of overpayments not occasioned by the recipient's willful withholding of information concerning his income or resources. The court's reasoning—that such recoupment requires the states to presume conclusively that the overpayment is currently available even though it may have been spent long ago—would appear to apply to a willful withholding of information case. *Cf. Cooper v. Laupheimer,* 316 F.Supp. 264 (E.D.Penn.1970).

We reject the reasoning of *National Welfare Rights Organization v. Weinberger* which would apply the assumption of income rule to the recoupment situation, and adopt the position of those courts which have held the recoupment regulation not to violate 42 U.S.C.A. § 602(a)(7). *See Gardenia v. Norton,* 425 F.Supp. 922 (D.Conn. 1976); *Jackson v. Weinberger,* 407 F.Supp. 792 (W.D.N.Y.1976). This case is not controlled by *Van Lare v. Hurley, Lewis v. Martin,* or *King v. Smith,* for Louisiana's recoupment procedure does not assume that past overpayments are still available to the welfare child when it reduces current benefits under its recoupment policy. The reduction in current payments below the amount which the recipient would otherwise be entitled is made because the recipient has wrongfully acquired an overpayment in the past. The state does not alter its practice of considering only income and resources available on a regular basis in determining need and the level of benefits to which the recipient is rightfully entitled. The recoupment policy is unrelated to need, except to the extent its limitation proviso would prevent undue hardship. Rather, it is designed to assure that the welfare recipient is unable to acquire fraudulently more than his entitlement at the expense of other families benefitting from the AFDC program.

The second specific section of the Act that the plaintiffs contend the recoupment regulation violates is 42 U.S.C.A. § 602(a)(10). That section provides that AFDC shall "be furnished with reasonable promptness to all eligible individuals." Plaintiffs' premise is that a state may not add an eligibility standard that results in the exclusion of persons eligible for benefits under federal standards. *See Townsend v. Swank,* 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971). Plaintiffs argue that since they meet both the permissible tests for determining eligibility—the "dependency" standard of the federal statute and the "need" standards of the state plan—denial of their full AFDC benefits must be the result of an impermissible eligibility standard. They urge that the policy imposes as a condition of eligibility that a child must be supervised by a relative who has not engaged in willful withholding of pertinent information from the welfare authorities.

The recoupment regulation does not impose a condition of eligibility. It does not affect eligibility for aid, only the amount an otherwise eligible recipient is entitled to receive. As the court stated in *Gardenia v. Norton,* 425 F.Supp. 922 (D.Conn.1976):

Children whose supervising relative has been convicted of welfare fraud remain *eligible* for AFDC benefits. The reduction in actual assistance payments is an entirely different process from the determination of a child's threshold eligibility for the AFDC program. The defendant is free to make adjustments in the level of assistance payments without transgressing the requirement that eligibility determinations are to be made under federal standards.

425 F.Supp. at 927. The recoupment regulation does not add an eligibility requirement. To the contrary, it operates to insure that eligible persons receive the exact amount of their eligibility entitlement.

Plaintiffs have not been denied their full AFDC benefits. In fact, at any point of time after the overpayment but prior to the completion of the recoupment process, a family in plaintiffs' class would have received from the program *more* than its entitlement. At the completion of the recoupment process, the total amount of the assistance grants given that family would be equal to the total amount for which the family was eligible.

Over the long run, plaintiffs received the exact amount of assistance under the program their circumstances of need made them eligible to receive. The recoupment regulation allows Louisiana to administer its AFDC program in a manner that assures a fair dispensation of limited funds to all eligible families according to their need. The regulations are consistent with the purposes of the Act, they do not conflict with any provision of the Act, and they are a valid exercise of HEW's broad authority to provide for the efficient administration of the program.

II. The Food Stamp Disqualification Regulation

■ The Food Stamp Act, 7 U.S.C.A. § 2011 *et seq.*, was enacted to "alleviate . . . hunger and malnutrition" through a program designed to "permit low-income households to purchase a nutritionally adequate diet through normal chan-

nels of trade." 7 U.S.C.A. § 2011. The program allows eligible recipients to purchase food stamp coupons at prices below their face value. These coupons may then be used at face value to purchase food at qualifying retail stores. 7 U.S.C.A. § 2013(a). Except for administrative costs, which are borne by the states, the program is funded by the United States government. *See* 7 U.S.C.A. §§ 2024, 2025.

The Secretary of Agriculture was given the authority to formulate and administer the program that Congress described in general terms. 7 U.S.C.A. § 2013(a). In particular, the Secretary was given the authority to issue "such regulations, not inconsistent with this chapter, as he deems necessary or appropriate for the effective and efficient administration of the food stamp program." 7 U.S.C.A. § 2013(c). Pursuant to this authority, the Secretary in 1971 promulgated the regulation in issue here:

> . . . If the State agency finds that any eligible household has failed substantially to comply with the provisions of this part, the Plan of Operation, or any procedures or instructions issued by FNS or the State agency resulting in the fraudulent acquisition of coupons, such household may be disqualified from further participation in the program by the State agency for such period of time as the State agency shall determine.

7 C.F.R. § 271.7(e) (1977). Louisiana policy, consistent with this regulation, allows disqualification of a recipient who acquires coupons through fraudulent conduct for a length of time determined by the severity of the violation.

Plaintiffs shoulder the same heavy burden in attacking this administrator's interpretation of the statutory scheme he carries out. *Johnson's Professional Nursing Home v. Weinberger*, 490 F.2d 841 (5th Cir. 1974). Especially is that the case where the Secretary's statutory authority is as broad as it is in 7 U.S.C.A. § 2013(c), which allows him to issue such regulations that he deems "appropriate for the effective and efficient administration of the food stamp program."

*Cf. Mourning v. Family Publications Service,* 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973).

The disqualification regulation clearly is appropriate for the effective and efficient administration of the program. Even in the absence of explicit congressional authority, such powers have been held "inherent and necessarily incidental to the effective administration of the statutory scheme." *See Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 187, 334 F.2d 570, 577 (1964). The regulation gives the administrative authorities a tool with which to protect the program from those who would abuse it. As the district court noted, the integrity of such a program must depend in large measure upon the accuracy and honesty in fact of applicants and recipients. This regulation, as it is embodied in Louisiana policy, encourages accuracy and honesty and it therefore is an appropriate administrative tool. Unless Congress has specifically removed this administrative power from the Secretary, or unless the regulation is "inconsistent with [the Act]," 7 U.S.C.A. § 2013(c), the regulation must be upheld.

Plaintiffs' first attack on the disqualification regulation centers around the legislative history of the Act. Plaintiffs point out that Congress in 1964 expressly provided criminal sanctions for dealing with recipient fraud in the Food Stamp Act itself, *see* 7 U.S.C.A. § 2023, but it did not provide for termination from the program in such event. Therefore, they urge the conclusion must follow that Congress, deeming these criminal penalties sufficient, removed from the Secretary any authority to terminate needy households because of fraud.

Another indication that Congress did not intend the Secretary to have authority to issue the fraud termination regulation is said to be Congress' rejection of a bill containing a specific provision mandating termination for fraud during its consideration of the 1971 amendments to the Food Stamp Act. Finally, plaintiffs point out that the Food Stamp Act was amended by Title XIII of the Food and Agriculture Act of 1977, Pub.L.No.95–113 (Sept. 29, 1977), to prohibit participation in the program for specified periods of time by individuals who have fraudulently procured or used food stamp coupons. Plaintiffs' argument is that this subsequent legislative consideration and enactment of such provisions would have been unnecessary if Congress had already given the Secretary the power to disqualify by regulation.

This legislative history does not indicate that Congress withheld from the Secretary the authority to promulgate the regulation in issue here. Neither before nor after the Secretary adopted the attacked regulation has Congress acted to expressly negate the power which the Secretary claims. The power to disqualify on account of fraud is inherent in the effective administration of such a program, and therefore is expressly within the authority given to the Secretary in 7 U.S.C. § 2013(c). That Congress provided specific criminal penalties for dealing with fraud does not mean that Congress meant to prohibit utilization of the reasonable administrative device of termination for fraud. There is no requirement that such inherent administrative powers be prescribed with the specificity required for penalty provisions. *See Gonzalez v. Freeman,* 118 U.S.App.D.C. 180, 187–88, 334 F.2d 570, 577–78 (1964); *cf. L. P. Steuart & Bro. v. Bowles,* 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350 (1944).

Nor do congressional actions in 1971 and 1977 yield the conclusion that plaintiffs would have us draw. That a later Congress seeks to grant expressly a power which an earlier Congress has granted by implication does not negate the existence of the power prior to the express grant. *Cf. United States v. Southwestern Cable Co.,* 392 U.S. 157, 169–71, 88 S.Ct. 1994, 2001–02, 20 L.Ed.2d 1001 (1968). Similarly, the failure of the House of Representatives in 1971 to pass a bill which included a section providing for termination for fraud cannot be interpreted as an affirmative withdrawal of a power that had already been granted, especially since the termination provision was only one of many parts of the defeated bill. Given the Secretary's broad grant of

authority by Congress in 1964 and the inherent nature of the power to disqualify for fraud in the power to administer, we cannot interpret Congress' action in 1971 and 1977 as establishing that the Secretary before 1977 was without power to issue the attacked regulation.

Plaintiffs next attack the disqualification regulation as a condition of eligibility not authorized by the Food Stamp Act. In the Act itself Congress has specified eligibility standards, the most important of which is need. *See* 7 U.S.C. §§ 2011, 2014(a). Others include the "household" limitation, defined in 7 U.S.C. § 2012(e), and a work requirement for able-bodied adults. 7 U.S.C. § 2014(c). Congress did not provide for fraud disqualification, and plaintiffs argue that such an eligibility requirement is invalid since it is not related to the congressional goal of feeding needy people.

To the extent that the fraud disqualification regulation is used to recoup the value of food stamp coupons fraudulently acquired, we uphold the policy for the same reasons stated in Part I of this opinion upholding the AFDC recoupment regulation. Not only is recoupment an appropriate administrative tool, but the government also has a common law right to recoup value fraudulently obtained from it. The exercise of such a right does not deny aid to eligible households but rather enforces the eligibility standards that Congress set. To the extent that the period of disqualification results in recoupment, the household over a period of time receives exactly the value of coupons to which it is entitled by the program's eligibility standards.

The regulation goes farther than recoupment, however, and allows disqualification "for such period of time as the State agency shall determine." The policy of the Louisiana agency determines that the length of the disqualification is to be measured "by the severity of the violation." The state agency in this case has thus reasonably interpreted the regulation to provide a limited discretion. It does not claim the arbitrary prerogative to disqualify a household forever. Using the severity of the offense to determine the length of disqualification is a proper application of the regulation's authority. This aspect of the regulation is valid if the state agency, on a case-by-case basis, can demonstrate that disqualification for a period of time longer than that necessary for recoupment is reasonably related to the efficient administration of the program.

While it is true that Congress intended to feed the needy through the food stamp program, it is equally true that Congress intended the program to be operated efficiently and free from fraud. Making ineligible for a period of time those who have abused the program is a valid administrative tool that furthers the integrity of the program and insures that the program benefits are made available to the truly needy. Plaintiffs' argument that the regulation is an eligibility requirement unrelated to congressional purposes must fail.

Finally, we reject plaintiffs' argument that the regulation is invalid because it fails to establish a uniform national standard of eligibility. The fact that the regulation does make some households temporarily ineligible to receive food stamp coupons does not make it an eligibility standard or affect those standards as otherwise set. The regulation functions primarily as an administrative tool, and thus its existence and use is entirely proper. Giving the states this degree of flexibility in administering the program is both desirable and reasonable. The regulation is a valid exercise of the broad authority given to the Secretary and is not inconsistent with the Act.

The district court's denial of injunctive relief is

AFFIRMED.