**Cesar A. PERALES, Commissioner of the New York State Department of Social Services, Plaintiff,**

v.

**Margaret M. HECKLER, as Secretary of the United States Department of Health and Human Services, Defendant.**

**No. 83–CV–900.**

United States District Court, N.D. New York.

Oct. 1, 1984.

Robert Abrams, Atty. Gen. of N.Y., Albany, N.Y., for plaintiff; James McSparron, Robert B. Keyes, Asst. Attys. Gen., Albany, N.Y., of counsel.

Frederick J. Scullin, Jr., U.S. Atty., Albany, N.Y., Juan A. del Real, Office of the Gen. Counsel, Dept. of Health and Human Services, Baltimore, Md., for defendant; William P. Fanciullo, Asst. U.S. Atty., Albany, N.Y., Ann T. Hunsaker, Asst. Gen. Counsel, Thomas K. Stuber, Baltimore, Md., of counsel.

## MEMORANDUM–DECISION and ORDER

MINER, District Judge.

### I

This action, seeking judicial review of a final decision of the Departmental Grant Appeals Board ("GAB") of the United States Department of Health and Human Services ("HHS"), challenges a decision by HHS disallowing certain of plaintiff's claims for Federal Financial Participation ("FFP") arising from overpayments under the Medical Assistance Program, more commonly known as Medicaid, found in Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396p. The action, which seeks declaratory and injunctive relief, is brought pursuant to 5 U.S.C. §§ 702, 703 and 28 U.S.C. §§ 2201, 2202. Jurisdiction is predicated upon 28 U.S.C. § 1331. Before the Court is defendant's motion for judgment on the pleadings, Fed.R.Civ.P.

12(c), and plaintiff's motion for judgment on the pleadings, or, in the alternative, for summary judgment, Fed.R.Civ.P. 56(a).

## II

### A. *Statutory Background*

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396p, provides for the establishment of cooperative federal/state programs, called "Medicaid," to provide payments for "necessary medical services" rendered to certain needy individuals "whose income and resources are insufficient to meet the costs of ... [such] services...." 42 U.S.C. § 1396. States are not required to institute a Medicaid program but, upon choosing to do so, they must submit to the Secretary of HHS a satisfactory "State plan for medical assistance" that fulfills all requirements of the Social Security Act. 42 U.S.C. §§ 1396, 1396a. The Secretary must approve a state plan that meets all requirements of Title XIX of the Social Security Act and its implementing regulations. 42 U.S.C. § 1396a(b). The state thereby becomes entitled to FFP in expenditures that it makes to provide specific types of medical assistance to eligible individuals in accordance with the approved state plan and federal law. 42 U.S.C. § 1396b.

The State of New York participates in Medicaid pursuant to N.Y.Soc.Serv.Law §§ 363–369 (McKinney 1983), in accordance with its federally approved state plan. Under that plan, rates for residential health care facilities are established prospectively through the use of fiscal and statistical data relating to a facility's past cost history. The federal government shares in the costs of the program by reimbursing the state for expenditures made for medical assistance under the plan. The amount of FFP is calculated according to the federal medical assistance percentage, 42 U.S.C. § 1396b(a)(1), and is, in New York, approximately fifty percent of the total expenditures for participation medical assistance. For a state to receive FFP payments, it must make proper expenditures pursuant to its federally approved plan. If the Sec-

retary finds that the state plan or the administrator thereof fails to comply with § 1396a, the Secretary may withhold federal funds from the state. 42 U.S.C. § 1396c.

Under this statutory scheme, the Secretary makes quarterly payments to the state, subject to later adjustment to the extent of any overpayment or underpayment which the Secretary determines was made to the state for any prior quarter. 42 U.S.C. § 1396b(d)(1), (2). Thirty days after the end of each quarter, the state must submit to the Health Care Financing Administration ("HCFA"), the constituent agency of HHS charged with administering the Medicaid program, a report of its actual quarterly expenditures. After review of the quarterly statement, the Secretary determines which of the state's actual expenditures were properly allowable for FFP and then determines the extent to which the state's quarterly estimate was greater or less than the amount of properly allowable actual expenditures. When the Secretary finds that the state's prior quarterly estimate exceeds the amount which the state expended for allowable costs, the Secretary reduces future FFP to the state in order to adjust for the amount of the state's overestimate for any prior quarter. 42 U.S.C. § 1396b(d). If a state disputes the amount of the disallowance, it may request reconsideration by GAB. 42 U.S.C. § 1316(d).

### B. *Factual Background*

The New York State Department of Social Services ("DSS") has been designated as the single state agency empowered to supervise the administration of New York's medical assistance program. In fulfilling its functions, DSS shares responsibility for identifying and recouping Medicaid overpayments with the Office of New York State's Deputy Attorney General for Medicaid Fraud Control ("DAG").

On November 10, 1981, HCFA, acting through the Federal Office of the Inspector General Audit Agency ("OIGAA"), completed an audit of DAG's actions covering the period January 10, 1975 to April 30,

1980. The audit findings were set forth in a report entitled "Report on Review of Credits Due the Federal Government Under the Medical Assistance Program Resulting from Audits and Investigations of the Deputy Attorney General for Medicaid Fraud Control" ("Audit Report"). *See* Administrative Record at 76–105 [hereinafter cited as "AR"]. Based on the Audit Report, HCFA determined that the State of New York had been overpaid $1,550,644 in FFP and requested that DSS make a decreasing adjustment for that amount in the next quarterly expenditure report.

The determination by HCFA was predicated upon the Medicaid investigative and recovery efforts of DAG and the specific identification by DAG of improper payments to various long-term health care providers, over ninety percent of which were nursing homes. By March 31, 1980, DAG had established $2,570,996 in overpayments which it was in the process of recovering. It was on this amount, unrecovered by the time of the Audit Report, that HCFA required a return of FFP, computed to be $1,274,865. HCFA also determined that an additional amount of $275,779 was refundable to the federal government based on a recomputation of the rate of FFP used by the state in making certain refunds of recovered overpayments. This latter determination, however, was reversed on appeal to GAB and is not in issue here.

Despite what appear to have been intensive efforts by DAG to recover vast overpayments, and notwithstanding the Audit Report's conclusion that "generally, the procedures followed by the DAG and DSS to recoup and report Medicaid overpayments identified by the DAG were adequate ...," AR at 83, OIGAA recommended that the federal government recover its full share of the $2,570,996 in overpayments. That recommendation was adopted by HCFA in a decision dated November 10, 1981. AR at 106–09. That decision was appealed to GAB pursuant to

45 C.F.R. Part 16. On June 16, 1982, GAB issued a final decision affirming HCFA's disallowance of FFP for the unrecovered provider overpayments totaling $2,570,996. The matter was remanded to HCFA, however, to recompute the outstanding balance of the unrecovered overpayments under the applicable rate.

On August 3, 1982, HCFA implemented the GAB decision and recouped $1,182,568 (the amount of FFP recomputed on remand) by an adjustment to the Medicaid grant to the state for the quarterly period April 1, 1982 to June 30, 1982. A review of that determination is the subject of the present suit.

### C. *Plaintiff's Claims*

Apparently, plaintiff does not dispute the impropriety of the state's overpayments, or the total dollar amount involved. Rather, "the dispute revolves around only one question of law: whether the State must refund or credit the Federal share of these overpayments ... to the Federal Government prior to the State's recovery of these funds from the providers." Defendant's Memorandum in Support of Motion for Judgment on the Pleadings at 8. GAB, of course, determined that New York must credit the federal share of overpayments based upon 42 U.S.C. § 1396b(d)(2). Plaintiff's complaint raises three distinct challenges to that determination. First, plaintiff contends that GAB's decision "is contrary to 42 U.S.C. § 1396b(d)(3), which allows the Secretary to effect a recovery of FFP by decreasing adjustment to the quarterly Medicaid grant pursuant to 42 U.S.C. § 1396b(d)(2) only by the net amount actually recovered by the State from the provider." Complaint, ¶ 21. Second, plaintiff contends that GAB's decision "is contrary to the design, principles and purposes of the Medicaid program under Title XIX as a jointly financed and cooperative federal/state venture to help persons in need of medical assistance." *Id.*, ¶ 22.[1] Finally, plaintiff urges that

---

**1.** Specifically, plaintiff argues that GAB's decision "in effect requires the State of New York to bear alone, without federal financial aid, the

full cost of unrecovered overpayments which were payments the State then made in good faith to providers, and which were then proper-

[t]he decision of the Board [GAB] sustains a previously unannounced policy by the Secretary, whereby the Secretary effectively recoups FFP from States where overpayments are identified but not recovered from providers of assistance, notwithstanding efforts to recover such overpayments, which policy is contrary to 42 U.S.C. § 1396b(d)(3) and to the design, principles and purposes of Title XIX. Insofar as such policy may be found to be in conformity with Title XIX, such policy, nevertheless, is invalid, since it was not effected by rule promulgated in accordance with the rule-making notice and other procedural requirements of the Administrative Procedure Act, 5 U.S.C. § 553 and did not comply with the information and publication requirements of the Freedom of Information Law [sic], 5 U.S.C. § 552.

*Id.,* ¶ 23. Both parties now move for judgment on the pleadings based on the administrative record.

### III

■ The applicable standard of review here entails determination of whether the action complained of was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). *See Michigan Department of Social Services v. Schweiker,* 563 F.Supp. 797, 798 (W.D.Mich.1983). While the ultimate standard of review is a narrow one, both because the Court is not empowered to substitute its judgment for that of the agency, *see Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), and because the agency decision is entitled to a presumption of regularity, *id.* at 415, 91 S.Ct. at 823, the Court must still engage in a "substantial inquiry," *id.,* and must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

ly federally participating and which the State has now fully attempted in good faith to recov-

### A. *Recovery of Overpayments*

The present controversy centers upon the Secretary's allegedly improper interpretation and application of 42 U.S.C. § 1396b(d). That section provides, in relevant part:

(2) The Secretary shall then pay to the State, in such installments as he may determine, the amount so estimated, reduced or increased to the extent of any overpayment or underpayment which the Secretary determines was made under this section to such State for any prior quarter and with respect to which adjustment has not already been made under this subsection. Expenditures for which payments were made to the State under subsection (a) of this section shall be treated as an overpayment to the extent that the State or local agency administering such plan has been reimbursed for such expenditures by a third party pursuant to the provisions of its plan in compliance with section 1396a(a)(25) of this title.

(3) The pro rata share to which the United States is equitably entitled, as determined by the Secretary, of the net amount recovered during any quarter by the State or any political subdivision thereof with respect to medical assistance furnished under the State plan shall be considered an overpayment to be adjusted under this subsection.

According to plaintiff, § 1396b(d)(3) limits the federal government's recoupment of its share of overpayments by a state to a provider to the net amount of such overpayment that the state actually recovers. Plaintiff claims that the GAB ignored the plain language of that section and allowed the recoupment of FFP in unrecovered overpayments by erroneously relying on § 1396b(d)(2). In particular, plaintiff argues that that section,

in providing that the Secretary shall make an adjustment in the quarterly

er." Complaint, ¶ 22.

grant to the extent of any "overpayment" made to the State in any previous quarter, simply provides for the reconciliation between prior estimates and actual expenditures. The term "overpayment," as used in section 1396b(d)(2) does not by itself apply to State claims for overpayment made against a provider.

Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings at 11. Plaintiff concludes, therefore, that it is "only by virtue of section 1396b(d)(3) that the net amount of overpayments recovered by the State, 'shall be considered an overpayment to be adjusted under this subsection.'" *Id.* The analysis provided by plaintiff in support of this position is meager at best. Indeed, Plaintiff is content simply to rely on the decision of *Massachusetts v. Heckler*, 576 F.Supp. 1565 (D.Mass.1984), which held that where a change in the interim rate of reimbursement results in state overpayments to providers, FFP is not subject to recoupment by the federal government until the state itself has effected a recovery of such overpayments from the providers.[2] Based on that case, plaintiff argues that "there is no evidence to establish that the State payments, made to providers in good faith pursuant to the approved State Plan can be considered as overpayments under section 1396b(d)(2) ... [since] [t]he fact that at some later time, it turned out that the State had made overpayments, does not retroactively change the nature of the original payments as medical assistance payments under Title XIX." *Id.* at 12–13.

After a review of the statutory language, the relevant legislative history, and the sparse case law, this Court is persuaded that the Secretary's determination is a reasonable one and must therefore be upheld.

A number of factors convincingly support this conclusion. First, the language of § 1396b(d)(2) is clear in providing that "[t]he secretary shall then pay to the State ... the amount estimated, reduced or increased to the extent of any overpayment or underpayment...." There is simply no indication from that language that recovery of the federal share is somehow to be made contingent upon the state's prior recovery of any overpayments. The second sentence of § 1396b(d)(2), providing that "[e]xpenditures for which payments were made to the State under subsection (a) of this section shall be treated as an overpayment to the extent that the State or local agency administering such plan has been reimbursed for such expenditures by a third party ...," while supportive of the state's general position that federal recovery should be tied to a prior state recovery, is simply inapplicable in the present context. That sentence, as the legislative history makes clear, was intended to allow for recovery of the federal share of funds obtained by states from third parties who were liable for the medical care of a Medicaid recipient. It was not intended to cover overpayments of the type at issue here.

(K) *Payment for services by a third party*—It is obvious that many people need medical care because of an accident or illness for which someone else has fiscal liability; for example, a health in-

---

**2.** Plaintiff notes that the *Massachusetts* court, "perceiving an ambiguity between section 1396b(d)(2) and section 1396b(d)(3) resolved the ambiguity in favor of the State," Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings at 11, when it held:

> A careful reading of the statute exposes the ambiguity. The first sentence of § 1396b(d)(2) permits the Secretary to reduce the amount of FFP to the extent of any overpayment for any prior quarter; § 1396b(d)(3) indicates, however, that certain payments are not to be considered overpayments until the state has recovered the money from the

health care provider. Since the term "overpayment" is nowhere defined in the statute nor in the regulations, it is not clear which subsection applies in the present case.
> ....
> In the event that the state recovers the excess payment from the provider, the pro rata share of HHS in that recovery will be considered an overpayment under § 1396b(d)(3). Until such recovery occurs, however, HHS is not entitled to treat its payments to a state at an interim rate in excess of the final rate as overpayments.

At 1568, 1569.

surer or a party who is determined by a court to have legal liability. In order to make certain that the State and the Federal Governments will receive proper reimbursement for medical assistance paid to an eligible person when such third-party liability arises, a new requirement would be included in Title XIX. Under this provision, the State or local agency will have to take all reasonable measures to ascertain the legal liabilities of third parties to pay for covered services. Where the legal liability is known it would be treated as a resource of the recipient. In addition, if medical assistance is granted and legal liability of a third party is established later, the State or local agency must seek reimbursement from such party. The Federal Government would receive its share of any reimbursement received.

H.R.Rep. No. 544, 90th Cong., 1st Sess. 123 (1967).

It is also clear that, contrary to plaintiff's contention, § 1396b(d)(3) does not limit federal recovery of overpayments to situations where the state has already effected its own recovery. Section 1396b(d)(3) provides:

The pro rata share to which the United States is equitably entitled, as determined by the Secretary, of the net amount recovered during any quarter by the State or any political subdivision thereof with respect to medical assistance furnished under the State plan shall be considered an overpayment to be adjusted under this subsection.

In rejecting plaintiff's argument, GAB summarized its views as follows:

—Section 1903(d)(3) does not by its terms relate back to all overpayments contemplated by section 1903(d)(2).

—Since 1903(d)(3) refers to amounts recovered with respect to "medical assistance furnished under the State plan," it reasonably may be viewed as referring only to state payments which are allowable "medical assistance" costs, under section 1905(a) of the Act.

—The legislative history supports the Agency's position that section 1903(d)(3) was designed to authorize the Secretary to adjust in situations where a question might have existed as to a state's liability to repay the federal share or the Agency's ability to recoup the share by an offset to future claims.

—Neither the Agency nor the courts have ever interpreted section 1903(d)(3) to prevent adjustment under section 1903(d)(2) of an amount determined by the Secretary to be an overpayment, merely because the state has not recovered the amount from a provider.

AR at 435–36 (footnote omitted).[3] GAB then concluded that the flaw in the state's argument was that

the specific subject of (d)(3) is not "recovery of overpayments" as the State alleged, but treatment of certain recoveries as overpayments. The plain language of (d)(3) concerns amounts which would not ordinarily be considered "overpayments" because they were "medical assistance furnished under the State plan" and, therefore, were allowable when made. When such amounts are recovered, (d)(3) describes the extent to which the federal share is to "be con-

**3.** In a footnote, GAB noted:

While the legislative history of section 1903(d) does not explicitly explain the relationship of (d)(2) and (d)(3), it does state that the provisions of section 1903(d) are similar to those "under the existing public assistance titles of the act." H.R.Rep. 213, 89th Cong., 1st Sess. 188 (1964). The legislative history of the comparable provisions shows that the purpose was to treat recoveries of certain otherwise allowable costs as overpayments in order to permit the federal share to be recouped

through an offset against the state's next award of funds. *See* H.R.Rep. 728, 76th Cong., 1st Sess. 29, 33, 56, 75–76 (1939); *see also* Message of the President of the United States transmitting Report of the Social Security Board recommending changes in the Social Security Act, 76th Cong., 1st Sess., Document No. 110; House Committee on Ways and Means, Hearings relative to Social Security Act Amendments of 1936; 76th Cong., 1st Sess., Vol. 3, 2412–2417.

AR at 436 n. 2.

sidered an overpayment" for purposes of adjustment under (d)(2). Thus, (d)(3) does not constitute a limiting definition of the term "overpayment" in (d)(2). Contrary to the State's assertion, the Agency interpretation does not render (d)(3) superfluous, ineffective, or insignificant, but, rather, gives effect to both provisions and is supported by the statutory scheme as a whole.

AR at 436–37 (footnote omitted). This Court agrees with GAB's sound conclusion, as it is amply supported by the statutory language.

A number of other factors speak persuasively to the correctness of GAB's determination. First, it is to be noted that federal funding under the Social Security Act may only be provided for "medical assistance." Section 1396b(a)(1) provides that "the Secretary ... shall pay to each State ... an amount equal to the Federal medical assistance percentage ... of the total amount expended ... as medical assistance under the State plan." "Medical assistance" is defined by 42 U.S.C. § 1396d(a) as "payment of part or all of the cost of [covered] care and services...." There can be no doubt that overpayments of the type at issue here do not fall within the definition of medical assistance and therefore are not reimbursable expenses. The federal government cannot be held responsible for the state's improper payments. *See Florida v. Heckler*, No. TCA 82–0935, (N.D.Fla. Jan. 5, 1984).

Additional support for GAB's decision is found in the Secretary's regulations, which, although not discussed by GAB, demonstrate that plaintiff is not entitled to have the federal government share in the costs of overpayments. 45 C.F.R. § 201.5(a)(3) (1983) provides for the submission of quarterly statements of State expenditures which are to include "expenditures not properly subject to Federal financial participation which are acknowledged by the State agency or have been revealed in the course of an audit." 45 C.F.R. § 201.13 (1983) also requires that adjustments be made for claims in which it is determined that the federal government may not participate. That section provides:

> After consideration of a State agency's appeal [of proper audit exceptions] by the Administrator, [HCFA] advises the State agency of any expenditures in which the Federal Government may not participate and requests it to include the amount as adjustments in a subsequent statement of expenditures. Expenditures in which it is found the Federal Government may not participate and which are not properly adjusted through the State's claim will be deducted from subsequent grants made to the State agency.

These regulations are generally consistent with the regulations applicable to the administration of all federal grants and the principles for determining costs applicable to activities assisted by HHS grants. For example, 45 C.F.R. part 74, Appendix E, Part IX, § B.2 (1983) expressly provides that costs arising from bad debts are not allowable: "Losses arising from uncollectible accounts and other claims and related collection and legal costs are unallowable."

Finally, 42 C.F.R. § 447.296, which was in effect during the time period involved in this suit, indicates that New York is required to refund overpayments to the federal government regardless of recovery by the state. That regulation provided that "[t]he [state] agency must account for overpayments found in audits on the quarterly statement of expenditures no later than the second quarter following the quarter in which the overpayment was found." A similar regulation was discussed in *Jacquet v. Westerfield*, 569 F.2d 1339 (5th Cir.1978), involving a state's recovery from a recipient's grant of Aid to Families with Dependent Children, under a federal regulation that required the recoupment of overpayments when the overpayment had been obtained by fraud. In upholding the challenged regulation, the court noted the "broad grant of power given to the Secretary ... if [the regulations] are 'reasonably related to the purposes of the enabling legislation' and if they are not inconsistent

with the Act." *Id.* at 1341. The court rejected plaintiff's argument that the regulation was inconsistent with the Act, noting that nothing in the Act expressly forbade the recoupments at issue. The court also noted that nothing in the Act expressly authorized recovery. *Id.* at 1342. Here, however, the Medicaid statute expressly directs that the Secretary recover excess payments. 42 U.S.C. § 1396b(d)(2). Finally, the court noted that recovery of overpayments only had the effect of providing the state with the amount of assistance that should have been provided in the first place. 569 F.2d at 1344. The situation here is no different—recovery of the excess amounts of federal payments to the state leaves it with the amount to which it was actually entitled, since once the overpayments were established, the state had no entitlement to the federal share of those amounts.

Although the case law in this area is sparse, it too supports the Secretary's position. In *Florida v. Heckler*, No. TCA 82-0935 (N.D.Fla. Jan. 5, 1984), in which overpaid Medicaid providers were bankrupt and therefore unable to repay state overpayments made to them, Florida argued that it should not be required to bear the burden of the overpayments because the Medicaid program was a federal/state partnership and the statute did not permit the Secretary to recover FFP related to overpayments absent prior recovery by the state. In rejecting those arguments, the court concluded that HHS may "require Florida to bear the entire burden in the collection of overpayments it made to providers notwithstanding bankruptcy." Slip. op. at 6. The court reasoned that:

> Title 42 U.S.C. § 1396b(2) requires the Secretary to reduce current payments made to the State in excess of allowable costs made in any prior quarter. Title 42 U.S.C. § 1396b(d) does not provide an exception for uncollectible payments made by the State. A contrary finding would allow Florida to obtain funds in excess of the amount it uses for legit-

imate medical assistance. This Court finds that Florida's overpayments were not legitimate Medicade [sic] expenditures and the HHS is entitled to offset such sums.

Slip op. at 4–5.

Also of relevance is *Massachusetts v. Heckler*, 576 F.Supp. 1565 (D.Mass.1984). There, the court reversed a decision by GAB that had sustained a disallowance against Massachusetts. The disallowance had been based upon the state's failure to recoup payments made on an interim basis to providers that exceeded final rates determined by Massachusetts under its state plan. HCFA had taken the position that once final payment rates were determined, the state was entitled to federal matching only up to that final rate and that any excess constituted an overpayment. Significantly, the court agreed with HCFA that it need not await recoveries by a state to recover overpayments. Specifically, the court noted that "HHS is correct in stating that where there is an overpayment, there need be no recovery by the state before the overpayment can properly be disallowed." At 1568. The court went on to conclude, however, that HHS had "not provided any evidence to establish that payment to a state at a higher interim rate than final rate constitutes an overpayment for purposes of § 1396b(d)(2)," and therefore held that "[i]n the absence of such proof and in light of the policies underlying the Medicaid Act [it could] not accept HHS' position." *Id.* at 1568.

Plaintiff attempts to latch on to this aspect of the *Massachusetts* holding, arguing that in the present case there also is no evidence to establish that the state payments, made to providers in good faith pursuant to the approved state plan, can be considered as overpayments under § 1396b(d)(2). Without deciding the correctness of the *Massachusetts* court's holding that interim overpayments might not constitute overpayments under the statute,[4] this Court is persuaded that the over-

---

**4.** Defendant has pointed out to the Court that

this aspect of the *Massachusetts* decision has

payments at issue here are sufficiently distinguishable so as to be considered the type of overpayment contemplated by the statute. Unlike the setting of interim rates, which are necessarily based on historical costs and are therefore incapable of being gauged in advance with total accuracy, fraudulent overpayments, even when made by the state in good faith, remain entirely within the control of the state paying agency. Because the state, as the ultimate dispenser of funds, is in the best position to guard against injudicious payments, part of its partnership obligation with the federal government must be to assure the propriety of all payments made. Shifting the loss burden to the federal government could only invite increased involvement and supervision by the federal government in what is now essentially a state-run program. By requiring the state to suffer alone the consequences of erroneous payment, great incentive is maintained to assure efficiency and propriety in the allocation of Medicaid funds.

Because the Secretary's determination is fully supported by the statutory language, the regulatory provisions, and relevant case law, and because that decision is neither arbitrary nor capricious, it must be upheld.

### B. *Violation of the "Financial Compact"*

As a "second claim for relief," plaintiff argues that "recoupment of FFP prior to the State's recovery of overpayments is contrary to the financial compact between the states and the federal government underlying the Medicaid program." Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings at

15. Relying on the language of *Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980),[5] plaintiff argues that GAB's decision is contrary to and destructive of the Act's principles of "cooperative federalism" in that it makes the state bear the burdens of financial responsibility alone. In rejecting this argument, GAB itself sensibly noted that these general considerations did not justify adopting

> the State's strained reading of section 1903(d)(3), particularly where the Agency position is consistent with statutory provisions specifying the costs in which FFP will be available. Moreover, while it is true that Congress devised the Medicaid program as a joint federal-state endeavor, the states have the primary responsibility for administering the program, including the duty to take steps to prevent improper payments in the first instance and to identify and recover overpayments in a timely manner when they do occur.

AR at 438. GAB then concluded that "[v]iewing the program as a whole, therefore, we think that the Agency is not unreasonable in requiring the states to bear the burden of unrecovered overpayments." *Id.* Those conclusions are entitled to great deference and this Court sees no basis upon which to overturn them. While plaintiff is entirely correct in its characterization of Medicaid as a federal/state partnership, there is no basis to believe that some of the partners' obligations are not to be borne alone. As discussed above, precisely because the state is in the best position to detect and prevent Medicaid fraud, it must be charged with the responsibility for its prevention. To allow the state to

---

been appealed to the First Circuit, Docket No. 84–1197.

5. The language quoted consists of the following: The Medicaid program created by Title XIX is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons, ... [a] system of "cooperative federalism".... The cornerstone of Medicaid is financial contribution by both the Federal Government and the partici-

pating State. Nothing in Title XIX as originally enacted, or in its legislative history, suggests that Congress intended to require a participating State to assume the full costs of providing any health services in its Medicaid plan. Quite the contrary, the purpose of Congress in enacting Title XIX was to provide federal financial assistance for all legitimate state expenditures under an approved Medicaid plan.
448 U.S. at 308, 100 S.Ct. at 2683.

shift the cost of its own errors, however innocent they may be, could only lessen the efficiency of the entire program. The partnership upon which plaintiff relies does not in and of itself entitle the state to disclaim or abdicate its own obligations in order to make its own responsibilities easier to bear. While partnership losses are generally considered to be shared between the partners, those at issue here properly are borne exclusively by the state.

### C. *Consistency of the Secretary's Position*

Plaintiff's final claim for relief is predicated upon the argument that GAB's decision was based upon a policy, implementation of which allegedly ensued without any prior notification, asserted not to have been consistently applied in the past. According to plaintiff, this policy found its origins in a June 10, 1980 United States General Accounting Office report entitled "States Should Intensify Efforts to Promptly Identify and Recover Medicaid Overpayments and Return The Federal Share," AR at 30. According to plaintiff, the "report itself gives dramatic evidence that the federal policy on recoupment of overpayment was in shambles [sic]." Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings at 17. Plaintiff points to a number of statements contained in the report, including GAO's conclusion that "as a matter of practice, HEW [now HHS] is not usually requiring the States to refund the Federal share of overpayment recoveries until after collection is made...." AR at 52.

Plaintiff then concludes that the Secretary's statement of policy on recoupment of overpayments is a substantive rule within the meaning of the Administrative Procedure Act ("APA"), 5 U.S.C. § 551(1), implementation of which requires promulgation in accordance with the rule-making requirements of the APA, *see* 5 U.S.C. § 553, and contends that defendant's failure to comply with the APA requires overturning the Secretary's decision. This Court does not agree.

First, plaintiff's characterization of the Secretary's policy as inconsistent simply is not accurate. As noted in GAB's decision:

In *Massachusetts,* the Agency alleged that its interpretation of the relationship of section 1903(d)(2) and (d)(3) of the Act had been consistently applied for sixteen years in its regulations and fiscal procedures. We noted in our decision that Massachusetts did not dispute this claim. Although arguing here that Agency policy had not been consistent, New York did not cite to any Agency policy statement setting out an interpretation that adjustment of the federal share of payments determined by the Agency to be unallowable was contingent on collection. Instead, New York relied primarily on statements made in a report issued by the United States General Accounting Office.... Specifically, the State cited to page 2 of the report, which states:

HCFA had not established consistent policies and guidelines for States to use in administering overpayment recovery activities. Also, HCFA did not have a clear policy explaining when and under what circumstances Federal financial participation in outstanding overpayments would be denied.

We think the State's reliance on this report is misplaced. The statement concerning a lack of consistent policies relates to state administration of overpayment recovery activities, which is not at issue here. With respect to Agency policy governing denial of FFP in outstanding overpayments, the General Accounting Office (GAO) report merely states that the policy is not clear as to the timing and circumstances of such denial.

As we have discussed in previous Board decisions, any consideration of Agency policy in this area must recognize legitimate differences in treatment of various kinds of Medicaid "overpayments," and reasons why the Agency might wait for recovery, allow a reasonable time for recovery, or require immediate adjustment. *Florida,* cited above, at p. 12.; *New York,* Decision No. 284, cited above, at

pp. 7–8. The GAO report covered a broad range of overpayments, and we do not think it considered these differences. Regarding the specific situation here, where the Agency itself has determined through an audit that FFP has been claimed by the State for improper provider payments, the clear Agency policy has been to disallow the costs and to require the state to adjust immediately (or on an installment plan) when the disallowance decision is final. *See* 45 CFR 201.14(e) (1977–1981); 45 CFR 201.66 (1977–1981); *State of Georgia v. Califano,* 446 F.Supp. 404 (N.D.Ga.1977). Although a number of states have argued before the Board that the Agency should wait until recovery before disallowing, no state has called to Board attention any instance in which the Agency construed its disallowance authority to be contingent on recovery.

Accordingly, we conclude that the disallowance for unrecovered provider overpayments firmly established by the DAG should be upheld.

AR at 439–40. This Court finds no reason to disturb those findings.

■ With respect to the APA,[6] because plaintiff failed to raise that argument before the agency itself, review here is inappropriate. *See Federal Power Commission v. Colorado Interstate Gas Co.,* 348 U.S. 492, 498–99, 75 S.Ct. 467, 471, 99 L.Ed. 583 (1955); *Unemployment Compensation Commission of Territory of Alaska v. Aragon,* 329 U.S. 143, 155, 67 S.Ct. 245, 251, 91 L.Ed. 136 (1946) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented...."); *Toy Manufacturers of America, Inc. v. Consumer Product Safety Com-*

*mission,* 630 F.2d 70, 73 n. 5 (2d Cir.1980); *Getty Oil Co. v. Andrus,* 607 F.2d 253, 256 (9th Cir.1979); *Cisternas-Estay v. Immigration and Naturalization Service,* 531 F.2d 155, 160 (3d Cir.), *cert. denied,* 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127 (1976).

IV

On balance, in light of the deferential standard of review applicable here, the Court is unable to conclude that GAB's determination was arbitrary, capricious, or not otherwise in accordance with law. Accordingly, defendant's motion for judgment on the pleadings must be granted and plaintiff's complaint hereby is dismissed. Plaintiff's motion for judgment on the pleadings or in the alternative for summary judgment is denied.

It is so Ordered.

---

**6.** It is not at all clear whether the APA is in fact here relevant. Plaintiff argues that the APA rule-making requirements are applicable notwithstanding the exceptions which pertain to matters involving grants, *see* 5 U.S.C. § 553(a)(2) ("This section applies, according to the provisions thereof, except to the extent that there is involved—... a matter relating to agency management or personnel or to public property, loans, grants, benefits, or contracts"), because the Secretary has waived such exception. *See Humana of South Carolina, Inc. v. Califano,* 590 F.2d 1070, 1084 (D.C.Cir.1978). The *Humana* decision, however, noted that the waiver was effected in 1971 and found that the challenged regulations before it were issued in 1966, prior to any waiver. So too here, the challenged policy, according to GAB's decision, dated back some 16 years, also prior to 1971.